# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| SHIRLEY WILLIAMS, GALE PELFREY, BONNIE JONES and LORA SISSON, individually and on behalf of a class,<br><br>    Plaintiffs,<br><br>vs.<br><br>MOHAWK INDUSTRIES, INC.,<br><br>    Defendant. | )<br>)<br>)  Civil Action<br>)  File No. 4:04-cv-03-HLM<br>)<br>)  **CLASS ACTION**<br>)<br>)<br>)<br>)<br>)<br>) |

## REDACTED BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

Bobby Lee Cook
Georgia Bar No. 183100
COOK & CONNELLY
9899 Commerce Street
Summerville, GA 30747
(706) 295-0014

John E. Floyd
Georgia Bar No. 266413
BONDURANT, MIXSON & ELMORE LLP
3900 One Atlantic Center
1201 W. Peachtree Street, N.W.
Atlanta, Georgia 30309
(404) 881-4100

Howard Foster
(*admitted pro hac vice*)
JOHNSON & BELL, LTD.
Suite 4100
55 E. Monroe Street
Chicago, IL 60603
(312) 372-0770

Matthew Thames
Georgia Bar No. 703130
GODDARD, THAMES,
  HAMMONTREE & BOLDING
P.O. Box 399
Dalton, GA 30722-0399
(706) 278-0464

Attorneys for Plaintiffs Shirley Williams,
Gale Pelfrey, Bonnie Jones and Lora Sisson

## TABLE OF CONTENTS

Page No.

INTRODUCTION.................................................................................1

ARGUMENT AND CITATION OF AUTHORITIES...........................................3

I.  CLASS ACTIONS AIMED AT THE WIDESPREAD
    USE OF ILLEGAL WORKERS VINDICATE THE
    PURPOSES OF RICO AND THE IMMIGRATION LAWS ...................3

II. MOHAWK HAS VIOLATED RICO
    AND THE IMMIGRATION LAWS ............................................................5

III. EVERY CLASS MEMBER WILL BE ABLE TO RELY ON
     EVIDENCE OF MOHAWK'S REPEATED VIOLATIONS
     OF THE IMMIGRATION LAWS TO PROVE THEIR
     RICO CLAIMS............................................................................10

IV. PLAINTIFFS HAVE SATISIFED THE REQUIREMENTS
    FOR CLASS CERTIFICATION ..............................................................11

    A.  Plaintiffs Have Standing ....................................................11

    B.  Plaintiffs Have Satisfied the Rule 23(a) Requirements .................12

        1.  Numerosity..........................................................................12

        2.  Commonality .......................................................................15

        3.  Typicality ............................................................................17

        4.  Adequacy.............................................................................18

    C.  Plaintiffs' Claims for Injunctive Relief Satisfy
        Rule 23(b)(2) .......................................................................18

i

**D.    Plaintiffs' Claims Satisfy the Requirements of Rule 23(b)(3)** ...................................................................19

    **1.    Plaintiffs Have Satisfied the Requirement of Predominance**.......................................................19

        **a.    Federal RICO**.................................................21

        **b.    Georgia RICO** ...............................................25

        **c.    Injury** ...........................................................26

        **d.    Individual Issues Relating to Damages Do Not Predominate** ......................................35

    **2.    A Class Action Is the Superior Method for Adjudicating This Controversy** ...............................36

**CONCLUSION** ...........................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page No.**

*A.P.R.A. Fuel Oil Buyers Group, Inc.*
    320 N.L.R.B. 408, 413-414 (1995) [ ]...........................................................4

*Accord Interagency v. Danco Fin. Corp.*
    417 S.E.2d 46, 53 (Ga. App. 1992) ...............................................................11

*De Canas v. Bica*
    424 U.S. 351, 356-357 [ ] [1976] ...............................................................5, 30

*Dorsey v. State*
    279 Ga. 534, 615 S.E.2d 512, 518-19 (2005)...............................................10

*Dover v. State*
    192 Ga. App. 429, 431, 385 S.E.2d 417, 420 (1989) ....................................25

*Eisen v. Carlisle & Jacquelin*
    417 U.S. 156, 161 (1974) ...............................................................................2

*H.J., Inc. v. Northwestern Bell Tel. Co.*
    492 U.S. 229, 242 (1989) ........................................................................10, 24

*Ingram v. Coca-Cola Co.*
    200 F.R.D. 685, 699 (N.D. Ga. 2001) ...........................................................20

*In re Domestic Air Transp. Antitrust Litig.*
    137 F.R.D. 677, 692-93 (N.D. Ga. 1991)......................................................31

*In re Flat Glass Antitrust Litig.*
    191 F.R.D. 472, 486-87 (W.D. Pa. 1999)......................................................31

*In re Microcrystalline Cellulose Antitrust Litig.*
    218 F.R.D. 79, 93 (E.D. Pa. 2003) ................................................................31

*In re NASDAQ Market-Makers Antitrust Litig.*
    169 F.R.D. 493, 520 (S.D.N.Y. 1996)............................................................19

*In re Polypropylene Carpet Antitrust Litig.*
    996 F. Supp. 18, 26 (N.D. Ga. 1997)......................................................... 32-35

*In re Tri-State Crematory Litig.*
    215 F.R.D. 660 (N.D. Ga. 2003) ........................................................... *Passim*

*Jones v. Childers*
    18 F.3d 899, 911 (11th Cir. 1994) ...................................................................11

*Klay v. Humana*
    382 F.3d 1241 (11th Cir. 2004) ............................................................. *Passim*

*Mendoza v. Zirkle Fruit Co.*
    222 F.R.D. 439 (E.D. Wash. 2004) ....................................................... *Passim*

*Rotella v. Wood*
    528 U.S. 549, 557 [ ] (2000)..............................................................................3

*Sedima, S.P.R.L. v. Imrex Co.*
    473 U.S. 479, 496 (1985) ................................................................................22

*Sure-Tan, Inc. v. NLRB*
    467 U.S. 883, 892 [ ] (1984)..............................................................................5

*Trollinger v. Tyson Foods, Inc.*
    U.S. Dist. LEXIS 74114 ....................................................................... *Passim*

*United States v. Gonzalez*
    921 F.2d 1530, 1546 (11th Cir. 1991) .............................................................24

*United States v. Oreto*
    37 F.3d 739, 750 (1st Cir. 1994) ....................................................................23

*United States v. Starrett*
    55 F.3d 1525, 1544-47 (11th Cir. 1995)..........................................................24

*United States v. To*
    144 F.3d 737, 747 (11th Cir. 1998) ................................................................23

*United States v. Turkette*
    452 U.S. 576, 583 (1981) ................................................................24

*United States v. Zlatogur*
    271 F.3d 1025 (11th Cir. 2001) ................................................................7

*Williams v. Mohawk Indus., Inc.*
    465 F.3d 1277, 1290 (11th Cir. 2006) ................................4, 5, 22, 25, 26, 32

*Williams General Corp. v. Stone*
    279 Ga. 428, 430, 614 S.E.2d 758, 760 (2005) ................................4

## Federal Statutes and Regulations

8 U.S.C. § 1324(a)(3) ................................................................24
8 U.S.C. § 1324(a)(1)(A)(iii) ................................................................24
8 U.S.C. § 1324(a)(1)(A)(iv) ................................................................24
18 U.S.C. § 1546(a) ................................................................24
18 U.S.C. § 1546(b) ................................................................24
18 U.S.C. § 1962(c) ................................................................22, 23

8 C.F.R. § 274a.1(l) ................................................................13, 14
8 C.F.R. § 312.1 ................................................................7

222 F.R.D. at 442 ................................................................3, 15, 34, 37, 39

## State Statutes

O.C.G.A. § 16-4-4 ................................................................24, 25, 27
O.C.G.A. § 16-4-6(c) ................................................................26, 27
O.C.G.A. § 16-14-3(8)(A) ................................................................10

## Other Authorities

*See also President's Memorandum*, 60 FR 7885, 7886 ................................4

v

## INTRODUCTION

Plaintiffs seek redress for Mohawk's depression of their wages and the wages of Mohawk's legal hourly employees in North Georgia through the widespread hiring and harboring of illegal workers in violation of the federal and state RICO statutes. Plaintiffs' claims are appropriate for class certification because the answers to the critical questions of whether Mohawk has conducted or participated in a RICO enterprise and whether Mohawk has hired and harbored illegal workers are the same for every class member. The proof that Mohawk has engaged in such a pattern of racketeering activity is the same whether this case is an individual plaintiff's RICO action or a class action.

As the Eleventh Circuit's binding decision in *Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2004), confirms, proof of Mohawk's violations of RICO and the immigration laws is the predominant issue in this case. In *Klay*, the Eleventh Circuit upheld certification of a massive class "of almost all doctors" asserting civil RICO claims "versus almost all major health maintenance organizations." *Id.* at 1246. The Eleventh Circuit held that common issues of fact, including the existence of a conspiracy to violate RICO, the commission of a pattern of racketeering activity, and the existence of a RICO enterprise "tend to predominate over all but the most complex individualized issues." *Id.* at 1258-59. These are

1

"essential elements of each plaintiff's RICO claims" and "would necessarily have

to be re-proven by every plaintiff if each [plaintiff's] claims were tried separately."

*Id.* at 1257. "It is ridiculous to expect 600,000 doctors across the nation to

repeatedly prove these complicated and overwhelming facts." *Id.* at 1260.

The same things are true here of the RICO claims of thousands of hourly

Mohawk workers in North Georgia. Absent certification, every class member

would have to either abandon his or her claim or gather the same proof of

Mohawk's participation in an enterprise, conspiracy and pattern of racketeering

activity and present that proof to a different jury. The theoretical alternative to

class adjudication of this controversy, a proliferation of individual lawsuits for

wage depression, is unrealistic. The federal and Georgia RICO statutes are

complex. Indeed, Mohawk has twice appealed this case to the Eleventh Circuit

and the Supreme Court on just the issue of whether the Complaint states a claim.

That complexity coupled with the expense of litigating a RICO case, including the

expenses of discovery and expert testimony renders individual suits untenable. As

the Supreme Court held in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161

(1974), "[n]o competent attorney would undertake this complex antitrust action to

recover so inconsequential amount. Economic reality dictates that petitioner's suit

proceed as a class action or not at all."

2

Moreover, there is no reason that thousands of hourly workers should have

to go through the horribly inefficient process of filing separate RICO actions in

which they would each introduce the very same evidence to prove their claims.

The facts – Mohawk's hiring and harboring of vast numbers of illegal workers in

its facilities in North Georgia – are the same for every class member. Certifying a

class is the only way Mohawk's legal hourly workers can prosecute their claims

and the only efficient means for the Court to adjudicate those claims.

Two other district courts have certified similar class actions. *Trollinger v.*

*Tyson Foods, Inc.*, No. 4:02-CV-23, 2006 U.S. Dist. LEXIS 74114 (E.D. Tenn.

Oct. 10, 2006) (attached as Ex. 2); *Mendoza v. Zirkle Fruit Co.*, 222 F.R.D. 439

(E.D. Wash. 2004). No court has refused to certify such a case.

## ARGUMENT AND CITATION OF AUTHORITIES

I. **CLASS ACTIONS AIMED AT THE WIDESPREAD USE OF ILLEGAL WORKERS VINDICATE THE PURPOSES OF RICO AND THE IMMIGRATION LAWS.**

As the Eleventh Circuit observed during the interlocutory appeal of this

case, this action is consistent with the purposes of the federal RICO statute:

> It is consistent with civil RICO's purposes - to expand enforcement beyond
> federal prosecutors with limited public resources - to turn victims (here,
> Mohawk's legal workers) into prosecutors as private attorneys general
> seeking to eliminate illegal hiring activity by their own employer. *See
> Rotella v. Wood*, 528 U.S. 549, 557 [ ] (2000) (acknowledging that the very
> "object of civil RICO is . . . to turn [victims] into prosecutors, private

3

attorneys general dedicated to eliminating racketeering activity" (quotation marks and citation omitted)).

*Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1290 (11th Cir. 2006) (other citation omitted). This action is also consistent with the Georgia RICO statute's "goal of compensating victims and providing incentive for 'private attorney generals' to initiate actions against those in violation of the Act." *Williams General Corp. v. Stone*, 279 Ga. 428, 430, 614 S.E.2d 758, 760 (2005).

Further, this action is consistent with the purposes of federal immigration law. All three branches of federal government have recognized that the employment of illegal workers depresses wages for legal workers such as the class members here. As the district court summarized in *Trollinger*:

> [I]n enacting IRCA, Congress was motivated by the effects of illegal immigration on wage levels, particularly in unskilled jobs.
>
> > Both houses of Congress explicitly noted that the hiring of undocumented workers adversely affects American employees because alien workers, out of desperation, will work in substandard conditions and for starvation wages. Particularly affected, Congress found, are low-income and low-skilled Americans, including many members of minority groups, who compete most directly with undocumented aliens for jobs.
>
> *A.P.R.A. Fuel Oil Buyers Group, Inc.*, 320 N.L.R.B. 408, 413-414 (1995) [ ]. *See also President's Memorandum*, 60 FR 7885, 7886 . . . ("Employers who hire illegal immigrants not only obtain unfair competitive advantage over law-abiding employers, their unlawful use of illegal immigrants suppresses wages and working conditions for our country's legal workers."). Further, the United States Supreme Court has recognized the employment of illegal aliens

4

causes wage depression for workers who are legally employed. *De Canas v. Bica*, 424 U.S. 351, 356-357 [ ] [1976] ("acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens. . . ."); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 892 [ ] (1984) (same).

2006 U.S. Dist. LEXIS 74114, at **7-8; *see Williams*, 465 F.3d at 1289

(recognizing "direct correlation between illegal hiring and lower wages").

Certifying a class is the only realistic way to accomplish the legislative objective of having private attorneys general combat the use of illegal workers and protect the wages of legal workers. Individual RICO actions by individual workers are unrealistic and would not prevent the widespread use of illegal workers.

## II.    MOHAWK HAS VIOLATED RICO AND THE IMMIGRATION LAWS.

Although Plaintiffs have not yet had the opportunity to conduct formal merits discovery, even the limited evidence gathered to date demonstrates that Mohawk knowingly hires and harbors illegal workers in violation of the federal and Georgia RICO statutes. For example, an internal company document reveals that

**REDACTED**

---

[1] **REDACTED**                                    , *see* Ex. 3.

5

**REDACTED**

Ex. 4 (emphasis added).

Mohawk's internal documents also demonstrate that

**REDACTED**

Ex. 5.                         **REDACTED**

Ex. 6.

Indeed, the evidence to date indicates that Mohawk maintains a policy of

willful blindness to whether applicants and employees are authorized to work in

the United States that includes, *inter alia*, failing to use available government

6

databases to verify Social Security numbers; failing to provide hiring personnel with guidance on how to complete I-9 forms or how to verify employment eligibility; and ignoring an applicant or employee's inability to speak English (unless a job specifically requires English language proficiency in). Ex. 7 at 52, 54-57, 63-64, 90-91; *see* 8 C.F.R. § 312.1 (naturalized U.S. citizens must be able to speak English). As the Eleventh Circuit has held, "deliberate indifference to facts which, if considered and weighed in a reasonable manner, indicate the highest probability that the alleged aliens were in fact aliens and were in the United States unlawfully" would sustain criminal convictions on the immigration predicate acts at issue here. *United States v. Zlatogur*, 271 F.3d 1025, 1029 (11th Cir. 2001).

Additional evidence similarly indicates that Mohawk regularly receives information about illegal workers at its facilities. The Court is already familiar with former Mohawk supervisor Norman Carpenter's allegation that he was fired after reporting that many of the workers on his shift were not authorized to work in the United States. *See* Ex. 35, ¶¶ 21-33, 41-43, 51-53. Mohawk has also

**REDACTED**

Ex. 8.

**REDACTED**

Ex. 9 at

In addition to documents, sworn testimony proves Mohawk's RICO

violations.  For example, the Declaration of Christina Martinez, a current Mohawk

employee, establishes that Mohawk knows many of its workers are illegal and

knowingly accepts false documents to hire them:

> In 2003 or 2004, during my first employment with Mohawk, I had a
> conversation with Mohawk's Human Resources employee, Becky Hale.
> *Ms. Hale informed me that she was aware that many Mohawk employees
> are not legally authorized to work in the United States*.  She informed me,
> however, that if these employees came to Mohawk with a Social Security
> Number and a false identification, she could and would hire them and
> Mohawk would employ them.

Ex. 10 ¶ 4 (emphasis added).  Ms. Martinez also testified that she and Mr.

Carpenter interviewed a number of temporary workers who admitted they did not

have the documents required to work in the United States and reported that fact to

Mohawk and its lawyers.  *Id.* ¶¶ 6-7.

Plaintiff Shirley Williams related her Mohawk supervisor's detailed

explanation of why Mohawk hires illegal workers:

> You know, and he [Mohawk supervisor] would say I tell you what, *I can get
> me some illegal people come in over here*.  They can do their jobs.  They
> don't talk to me.  I don't have to talk to them.  They do their jobs.  They
> don't ask questions.  We don't have to pay out anything on them, and I hope
> you all understand tomorrow you might not even have a job.  I may make
> you leave today.

8

. . . .

Another time there was a Hyster accident, and he came out there so very mad. And he was saying -- he didn't say who is hurt, who needs an ambulance. He said, if I have to come back out here, the whole bunch is gone. ***That's why I prefer to hire illegal people***. There is none of this carryings on back here, all this talking, all this stuff going on and everything.[2]

. . . .

They would be -- ***he would say he had called and got some replacements, and it would be 20, 25 Mexican people that he said were illegal workers***, that he can go send Wayne, which was another person up there who was almost as rude as Roy, not as good as Roy, you know. But he said, ***I can send Wayne to Texas to bring back enough people to replace the whole push***.[3]

. . . .

Q.   Did Wayne tell you that he had actually hired illegal workers for Mohawk?

A.   He didn't do the hiring. He just said he went and got illegal workers for Roy to work there in Calhoun and in Dalton a[n]d Chatsworth and places.

Q.   Did Wayne tell you that Mohawk had actually hired illegal aliens?

A.   They were working there. I guess they were hired.

Q.   The question is ***did Wayne tell you Mohawk had hired illegal aliens.***

***A.   Yeah.***[4]

---

[2] Ex. 11 at 14-16 (emphasis added). Although Ms. Williams recently passed away, her videotaped deposition testimony will be admissible at trial pursuant to Fed. R. Civ. P. 32(a)(4)(A).

[3] *Id.* at 22-23 (emphasis added).

[4] *Id.* at 40-41 (emphasis added).

III.   **EVERY CLASS MEMBER WILL BE ABLE TO RELY ON EVIDENCE OF MOHAWK'S REPEATED VIOLATIONS OF THE IMMIGRATION LAWS TO PROVE THEIR RICO CLAIMS.**

The Named Plaintiffs and every member of the class will be able to rely on documents and testimony such as that cited above to prove their RICO claims. Every class member may use this and other common evidence to meet RICO's "pattern of racketeering activity" element, which involves proof of the continuity and relatedness of predicate acts.[5] Under Supreme Court authority, every class member may rely on proof of Mohawk's repeated violations of the immigration laws to show continuity and relatedness: "A party alleging a RICO violation may demonstrate continuity over a closed period by proving *a series of related predicates extending over a substantial period of time*." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989) (emphasis added). The relatedness of predicate acts may be established by showing that acts have the same or similar purposes, results, participants, methods of commission or are otherwise related by distinguishing characteristics. *Id.* at 240.[6] In addition, the

---

[5] Georgia RICO does not require proof of continuity; two related acts of racketeering activity are sufficient as a matter of law to establish a pattern under that statute. *Dorsey v. State*, 279 Ga. 534, 615 S.E.2d 512, 518-19 (2005).
[6] *See also* O.C.G.A. § 16-14-3(8)(A) (racketeering activity must "have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise [be] related by distinguishing characteristics and [ ] not [be] isolated incidents . . . .").

10

Eleventh Circuit has held that "*[a] showing that the predicate acts are 'part of an ongoing entity's regular way of doing business' would . . . satisfy the 'continuity' requirement either in the case where the entity is a traditional criminal enterprise or with respect to an ongoing legitimate business*." *Jones v. Childers*, 18 F.3d 899, 911 (11th Cir. 1994) (emphasis added) (citation omitted).[7] Thus, every class member can rely on a common set of proof – proof that relates solely to Mohawk's conduct and does not vary by plaintiff to plaintiff – to establish that Mohawk has violated the federal and Georgia RICO statutes.

## IV. PLAINTIFFS HAVE SATISIFED THE REQUIREMENTS FOR CLASS CERTIFICATION.

This Court's decision in *In re Tri-State Crematory Litig.*, 215 F.R.D. 660 (N.D. Ga. 2003), sets forth the Rule 23 factors to be considered on a motion for class certification.

### A. Plaintiffs Have Standing.

Mohawk has stipulated that Plaintiffs have standing to assert federal and Georgia RICO claims: "[T]he parties stipulate that any current or former hourly employee in Georgia of any Mohawk subsidiary (including, but not limited to, Gale Pelfrey. . . and Bonnie Jones) has standing to pursue claims for injuries to

---

[7] *Accord Interagency v. Danco Fin. Corp.*, 417 S.E.2d 46, 53 (Ga. App. 1992) (testimony regarding multiple predicate acts admissible to prove pattern of racketeering activity under Georgia RICO).

their wages against Mohawk in this action." Ex. 12 ¶ 6. Plaintiffs have worked for

Mohawk in hourly positions in North Georgia, have been injured by Mohawk's

depression of wages in violation of the RICO statutes and have standing to bring

this action.[8] In addition, Plaintiff Jones remains employed by Mohawk in an

hourly wage position in North Georgia and continues to suffer harm as a result of

Mohawk's unlawful conduct. She thus has standing to seek injunctive relief to

remedy that ongoing harm. *Tri-State*, 215 F.R.D. at 681.

## B.  Plaintiffs Have Satisfied the Rule 23(a) Requirements.

### 1.  Numerosity

The issue of numerosity is also not subject to dispute. Mohawk's Human

Resources database, Infinium, establishes that Mohawk has employed many

thousands of hourly workers in Georgia during the Class Period. Many of these

workers are legally authorized to be employed in the United States and are thus

members of the class. Indeed, Mohawk has admitted that: "From January 1, 1999

to the present, Mohawk, through its wholly-owned subsidiaries, has employed

more than 1,000 hourly workers authorized to work in the United States, within the

state of Georgia." Ex. 15 at 2-3. While the exact size of the class has not yet been

determined, it is clear that "joinder of all members is impracticable."

---

[8] *See also* Exs. 13 and 14.

Fed.R.Civ.P. 23(a)(1); *Trollinger*, 2006 U.S. Dist. LEXIS 74114, at **17-18

("Given the allegations contained within the complaint and the large number of

plant workers employed by Defendants spanning more than eight years at this

point, the Court is satisfied joinder of all class members is impracticable.").

The proposed class also meets the "minimal standard of identifiability." *Tri-

State*, 215 F.R.D. at 690. As this Court has held, "[i]t is not necessary that the

members of the class be so clearly identified that any member can be presently

ascertained" as long as the class members can be "ascertained through reasonable

effort." *Id.* (citations omitted). That is the case here. First, Plaintiffs will request

and the Court can order that Mohawk submit the names and social security

numbers of its Georgia hourly workers to the Social Security Administration's free

Basic Pilot (or "E-Verify") matching service.[9] Those workers whose names do not

match agency records are presumed to be unauthorized for employment. 8 C.F.R.

§ 274a.1(l). Plaintiffs can supplement this step by using databases, such as Lexis-

Nexis or People Finder, that also contain information on whether a specific social

security number was issued to a specific name. Second, notifications that third

parties, such as the SSA or health insurers, have provided to Mohawk that hourly

workers are using social security numbers that were issued to persons with

---

[9] The Infinium database lists the names and social security numbers of all of
Mohawk's hourly workers in Georgia. *See* Ex. 16 at 224-25.

different names can be used to assist in this effort. *See* Ex. 7 at 102-03, 126

(claiming that Mohawk investigates and retains no-match letters). Third, the

results of Mohawk's internal investigations into employment eligibility can be

used to identify unauthorized workers. *See id.* at 98-100, 103 (claiming that

Mohawk conducts an investigation any time a question is raised as to an

employee's eligibility to work in the United States); *see also* Ex. 17

**REDACTED**

Fourth, missing or improperly completed

I-9 forms create a presumption that an employer knows that an employee is not

authorized to work in the United States. 8 C.F.R. § 274a.1(l). Thus, such forms

can also be used to identify unauthorized workers.

The district court in *Mendoza* held that these methods for ascertaining the

identities of class members were adequate:

> Neither of [defendant's] objections precludes certification. A class does not
> have to be defined with precision at the outset. According to Professor
> Wright and his colleagues, the test is whether the description of the class is
> "sufficiently definite so that it is administratively feasible for the court to
> determine whether a particular individual is a member." ***Here, a class of***
> ***authorized workers clearly exists.*** Determining the identity of its members
> and providing them with adequate notice will not be easy. However, ***the***
> ***plaintiffs have provided an adequate plan for accomplishing these tasks***.

222 F.R.D. at 442 (emphasis added) (citation omitted). And the *Trollinger* court

agreed:

> Tyson alleges the Plaintiffs' proposal of identifying illegal workers employed by Defendants' is unmanageable. The Court is persuaded the combination of methods identified by Plaintiffs' are sufficient to show litigation in the form of a class action is preferable to any other method of adjudicating this controversy. Improperly completed I-9 forms will be cross-checked against mismatched Social Security names and numbers, Tyson's own internal identity investigations and third party notifications as outlined in Plaintiffs' memorandum and reply briefs.

2006 U.S. Dist. LEXIS 74114, at **31-32. As a result, *Trollinger* held that a class

of 'all persons legally authorized to be employed in the United States who have

been employed' at eight facilities is "based upon readily ascertainable criteria, as a

review of Tyson's employment records from April 1998 through the present should

identify the precise number and names of legally-employed workers". *Id.* at *16.

The same analysis applies here.

### 2.    Commonality.

Plaintiffs have also satisfied the "minimal showing," *Tri-State*, 215 F.R.D. at

690, required to establish that "there are questions of law or fact common to the

class." Fed.R.Civ.P. 23(a)(2). The common questions involved in this case

include, but are not limited to, the following:

(1)    **Enterprise**: Has Mohawk conducted or participated, directly or indirectly, in the conduct of an enterprise's affairs? What are the nature and extent of the relationships between Mohawk and the third parties that supply Mohawk with illegal workers?

(2)    **Pattern of Racketeering Activity**: Has Mohawk engaged in a pattern of racketeering activity? How many persons who are not

15

authorized to be employed in the United States has Mohawk
employed in hourly wage positions in Georgia during the Class
Period?  Did Mohawk knowingly hire those unauthorized aliens?
How many aliens has Mohawk harbored during the Class Period?  Did
Mohawk knowingly or recklessly harbor those aliens?  Has Mohawk
knowingly or recklessly encouraged or induced aliens to come to or
reside in the United States?  Has Mohawk knowingly accepted false
employment authorization documents?  Has Mohawk knowingly used
false identification documents?

(3)    **Conspiracy**:  Has Mohawk engaged in a conspiracy to violate § 16-
14-4(a) of the Georgia RICO statute?

(4)    **Injury:**  To what extent has Mohawk's pattern of racketeering activity
depressed the wages of the class members and/or increased or
maintained Mohawk's profits?

(5)    **Injunctive Relief:**  What injunctive relief is required to remedy
Mohawk's violations of the federal and Georgia RICO statutes?

The foregoing questions arise in the claims of the Named Plaintiffs and every

member of the class, and the answers will depend on common proof.

In *Trollinger*, the district court held that the presence of such questions

satisfied the commonality requirement:

The Court finds issues of law and fact common to all members of the
proposed class:  (1) whether or not Defendants engaged in the Illegal
Immigrant Hiring Scheme for financial gain in violation of RICO [see
Questions 1, 2 and 3 above]; and (2) whether the Illegal Immigrant Hiring
Scheme wrongfully resulted in a depression of the Class's wages [see
Question 4 above].  Both issues lie at the heart of each Plaintiff's theory, and
resolution of those questions could be dispositive.  Therefore, the Court
concludes commonality exists.

2006 U.S. Dist. LEXIS 74114, at *20 (footnote omitted).  The same is true here.

16

### 3.    Typicality.

The Named Plaintiffs satisfy the requirement of typicality because their claims "have the same essential characteristics as the claims of the class at large." *Tri-State*, 215 F.R.D. at 690 (citation omitted). "A representative plaintiff's claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and her or his claims are based on the same legal theory.'" *Id.* (citation omitted). The Named Plaintiffs' claims, like the claims of each class member, rest on allegations that Mohawk participated in a RICO enterprise and engaged in a pattern of racketeering activity that unlawfully depressed the wages of Mohawk's hourly workers in Georgia. The Named Plaintiffs' claims and the claims of the class members arise out of the same "course of conduct" (the operation and management of an enterprise through which Mohawk hires and harbors illegal workers) and "the same legal theory" (that this unlawful conduct depresses wages).

The district court in *Trollinger* found the typicality requirement satisfied in similar circumstances:

> In this case, the named Plaintiffs' injury is a typical result of Tyson's alleged conduct, such that the Court may properly attribute a collective nature to the challenged conduct. Specifically, Plaintiffs allege their wages were depressed as a direct result of Tyson's Illegal Immigrant Hiring Scheme. This injury is typical of the Class and it arises from the same conduct that gives claims to the proposed class members.

17

2006 U.S. Dist. LEXIS 74114, at *22.  The same is true here.

### 4.    Adequacy.

Plaintiffs have satisfied the requirement of adequate representation, which

"involves a two-part inquiry:  (1) whether Plaintiffs possess interests that are

antagonistic to the interests of other class members, and (2) whether the proposed

class' counsel possess the qualifications and experience to conduct the litigation."

*Tri-State*, 215 F.R.D. at 690-91.  Here, the Named Plaintiffs' interests in

prosecuting federal and Georgia RICO claims against Mohawk are the same as

those of the other class members.  *See, e.g.*, *Trollinger*, 2006 U.S. Dist. LEXIS

74114, at *24 ("the Named Plaintiffs have a common interest with the Class in

being compensated for their alleged injury caused by Tyson's Illegal Immigrant

Hiring Scheme").  Plaintiffs' counsel are well-qualified and have the experience to

conduct this litigation and to adequately represent the class.  Exs. 18-21.

### B.    Plaintiffs' Claims for Injunctive Relief Satisfy Rule 23(b)(2).

Plaintiffs' claims for injunctive relief satisfy Fed.R.Civ.P. 23(b)(2).  In

alleging that Mohawk has engaged in a widespread scheme to hire and harbor

illegal workers, plaintiffs allege that Mohawk "has acted . . . on grounds generally

applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the class as a whole."  *Id.*  That

18

injunctive relief could, for example, include the appointment of an independent

monitor to oversee Mohawk's verification of employment eligibility and to review

the employment eligibility of Mohawk's current population of employees, the

establishment of specific requirements for Mohawk to follow in verifying

employment eligibility, or both. While it is premature in advance of merits

discovery to specify the particulars, proof of liability would warrant class-wide

injunctive relief. *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D.

493, 520 (S.D.N.Y. 1996) ("[T]he contours of appropriate equitable relief will be a

common question of critical importance at trial.").

### C.    Plaintiffs' Claims Satisfy the Requirements of Rule 23(b)(3).

All of Plaintiffs' claims satisfy Fed.R.Civ.P. 23(b)(3), which includes

requirements of predominance and superiority.

### 1.    Plaintiffs Have Satisfied the Requirement of Predominance.

Whether a common issue predominates requires an assessment of "the

degree to which resolution of the classwide issues will further each individual class

member's claim against the defendant." *Klay*, 382 F.3d at 1254.[10]  Common issues

predominate if they "ha[ve] a direct impact on every class member's effort to

---

[10] See also *Tri-State*, 215 F.R.D. at 692 ("Whether an issue predominates can only
be determined after considering what value the resolution of the class-wide issue
will have in each class member's underlying cause of action.") (citation omitted).

establish liability and on every class member's entitlement to injunctive and

monetary relief." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001).

In *Tri-State*, this Court analyzed the predominance requirement "by setting forth

the elements of the substantive law for each cause of action" and determining

whether these elements were "subject to class-wide proof." 215 F.R.D. at 691.

Here, the issues the Named Plaintiffs seek to resolve – *e.g.*, whether Mohawk

conducted or participated in the affairs of an enterprise, engaged in a pattern of

racketeering activity and participated in a conspiracy – are issues that would have

to be resolved in every class member's individual RICO claim against Mohawk.

Thus, these common issues, which are subject to class-wide proof, predominate.[11]

*Klay* confirms that questions concerning the existence of a RICO enterprise,

pattern of racketeering activity and conspiracy are common questions that

predominate under Rule 23(b)(3). In *Klay*, the Eleventh Circuit upheld

certification of a class "of almost all doctors" asserting civil RICO claims "versus

almost all major health maintenance organizations." 382 F.3d 1246. *"[T]he*

*common issues of fact . . . concerning the existence of a national conspiracy, a*

*pattern of racketeering activity, and a Managed Care Enterprise, are quite*

---

[11] *Klay*, 382 F.3d at 1254 ("Under Rule 23(b)(3), 'it is not necessary that all
questions of fact or law be common, but only that some questions are common and
that they predominate over individual questions.'") (citation omitted).

**substantial.  *They would tend to predominate over all but the most complex***

***individualized issues*.**"  *Id.* at 1258-59 (emphasis added).  As in *Klay*, "the 'pattern

of racketeering activities' and the existence of a [ ] conspiracy" are "essential

elements of each plaintiff's RICO claims" here and "would necessarily have to be

re-proven by every plaintiff if each [legal worker's] claims were tried separately."

*Id.* at 1257.  The need for each of thousands of individual plaintiffs to prove the

same facts over and over again establishes predominance:

> In addition, even if many plaintiffs' claims require corroboration and
> individualized consideration, such inquiries are outweighed by the
> predominating fact that the defendants allegedly conspired to commit, and
> proceeded to engage in, a pattern of racketeering activities to further their
> Managed Care Enterprise.  It is ridiculous to expect 600,000 doctors across
> the nation to repeatedly prove these complicated and overwhelming facts.

*Id.* at 1260.

Fundamentally, common issues predominate here because "Plaintiffs' claims

focus on facts and issues common to Defendant['s] alleged behavior" rather than

on facts and issues specific to individual class members.  *Tri-State*, 215 F.R.D. at

695 n.22.  As in *Tri-State*, "the common questions related to Defendant['s] conduct

are unquestionably a very significant aspect – in fact, a pivotal aspect – of this

case."  *Id.* at 695.

    **a.**    **Federal RICO.**  Plaintiffs assert a federal RICO claim under 18

U.S.C. § 1962(c).  The elements of that claim are:  "(1) conduct (2) of an enterprise

(3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985) (footnote omitted); *Williams*, 465 F.3d at 1282 (same). All of these elements raise common questions that are subject to common proof.

The first two elements raise the common question of whether Mohawk "conduct[ed] or participat[ed], directly or indirectly, in the conduct of [an] enterprise's affairs." 18 U.S.C. § 1962(c). Testimonial and documentary evidence regarding the enterprise – an association in fact that includes Mohawk and third parties who supply illegal workers – will be common proof on which all class members can rely. Because the enterprise is an association in fact, much of the common proof establishing the nature of the association will demonstrate not only Mohawk's membership in the enterprise, but its dominant role in that enterprise.[12]

---

[12] *See, e.g.*, Ex. 22 at          **REDACTED**

*id.* at

*id.* at

The requirement that a defendant conduct or participate in the affairs of an enterprise can be satisfied in a number of ways.  For example, the Eleventh Circuit has held that proof of the knowing commission of multiple predicates acts in connection with a substantive RICO violation is all that is required.  *See United States v. To*, 144 F.3d 737, 747 (11th Cir. 1998).  This requirement can also be satisfied by proof that a defendant was essential to the existence of the enterprise.[13]  Proof of Mohawk's knowing commission of multiple predicate acts and Mohawk's centrality to the enterprise, therefore, will be common proof that will have "great value in the ultimate resolution of each class member's underlying [§ 1962(c) claim]."  *Tri-State*, 215 F.R.D. at 695.

Similarly, the third and fourth elements of plaintiffs' § 1962(c) claim raise the common question of whether Mohawk engaged in a pattern of racketeering activity.  As set forth in Section III, *supra*, that question also turns on common proof.  Here, the racketeering activity consists of five criminal violations: knowingly hiring unauthorized aliens in violation of 8 U.S.C. § 1324(a)(3); knowingly or recklessly harboring aliens in violation of 8 U.S.C.

---

*id.* at

**REDACTED**

Ex. 16 at 233-34 (same).

[13] *See, e.g., United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994) (Section 1962(c) satisfied where defendants were "plainly integral to carrying out the extortionate and usurious lending transactions at issue").

§ 1324(a)(1)(A)(iii); knowingly or recklessly encouraging or inducing aliens to

come to or reside in the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv);

knowingly accepting or receiving false employment authorization documents in

violation of 18 U.S.C. § 1546(a); and knowingly using false identification

documents in violation of 18 U.S.C. § 1546(b).

The evidence of these violations will have great value in proving the

elements of each class member's RICO claims. Not only will such proof establish

a pattern of racketeering activity for every class member, but it will overlap with

proof of the existence of an association in fact enterprise and Mohawk's role in

that enterprise, which are also elements of every class member's claim.[14] Further,

because numerous hiring decisions, employment applications and I-9 forms will be

at issue, it makes vastly more sense for a single jury to assess Mohawk's conduct

once, rather for thousands of juries to assess the same evidence over and over

---

[14] Evidence of these elements frequently overlaps in RICO cases. *See, e.g., United States v. Turkette*, 452 U.S. 576, 583 (1981) (the proof used to establish the separate elements of enterprise and pattern of racketeering activity "may in particular cases coalesce . . . ."); *H.J.*, 492 U.S. at 239 (proof of relatedness and continuity "will often overlap"); *United States v. Starrett*, 55 F.3d 1525, 1544-47 (11th Cir. 1995) (looking at the same evidence to conclude that defendant committed predicate acts that were related, that the continuity requirement was satisfied, and that the defendant played some role in the operation or management of the enterprise); *United States v. Gonzalez*, 921 F.2d 1530, 1546 (11th Cir. 1991) (evidence of even uncharged acts is "clearly relevant and admissible to proving RICO's other elements," such as pattern, enterprise, continuity, knowledge, agreement and participation).

again. As in *Klay*, the predominance of the common question of whether the defendant engaged in a pattern of racketeering activity is readily apparent.

      **b.**     **Georgia RICO.**  Plaintiffs also assert Georgia RICO claims under subsections (a) and (c) of O.C.G.A. § 16-14-4.  Proof that Mohawk acquired or maintained an interest in or control of an enterprise through a pattern of racketeering activity will make out a claim under subsection (a). *See* O.C.G.A. § 16-14-4(a).  Thus, the enterprise and pattern of racketeering activity issues discussed above also predominate for purposes of Plaintiffs' Georgia RICO claim.

      Plaintiffs and the class members can also prove a subsection (a) claim *without proof of an enterprise* simply by establishing that Mohawk acquired or maintained money, *e.g.*, profits, through a pattern of racketeering activity. *Id.*[15] Thus, the issue of whether Mohawk profited through a pattern of racketeering activity, which is also subject to common proof, also predominates.

      Finally, Plaintiffs' claim that Mohawk violated § 16-14-4(c) by "conspire[ing] or endeavor[ing] to violate . . . subsection (a)" raises another predominant common issue.  As the Eleventh Circuit has held, "[t]he existence of a

---

[15] *See also Dover v. State*, 192 Ga. App. 429, 431, 385 S.E.2d 417, 420 (1989); *Williams*, 465 F.3d at 1293 ("Unlike federal civil RICO, the Georgia RICO statute does not require proof of an 'enterprise.'") (citations omitted).

conspiracy," which is a matter of common proof, predominates in a RICO case. *Klay*, 382 F.3d at 1255.

      c.    **Injury.** The questions of whether and to what extent Mohawk's pattern of racketeering activity has depressed the wages of class members and increased or maintained Mohawk's profits are also common questions that predominate.  As in *Trollinger*, "whether the Illegal Immigrant Hiring Scheme wrongfully resulted in a depression of the Class's wages" is a common question. 2006 U.S. Dist. LEXIS 74114, at *20.  Under 18 U.S.C. § 1964(c), plaintiffs asserting federal RICO claims "must show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Williams*, 465 F.3d at 1283.  The statute "does not require plaintiffs to show that the injurious conduct is the sole cause of the injury asserted." *Id.* at 1288 (citation omitted).  "[I]t is enough for the plaintiff to plead and prove that the defendant's tortious or injurious conduct was a 'substantial factor in the sequence of responsible causation.'" *Id.* at 1288 n.5 (citation omitted).  Under Georgia RICO, a claim for damages similarly may be brought by "[a]ny person who is injured by reason of any violation" of § 16-4-4.  O.C.G.A. § 16-4-6(c).

      Plaintiffs allege that Mohawk's hiring and harboring of illegal workers causes injury by depressing the wages of all class members.  Plaintiffs will offer

common proof to support this allegation. First, Plaintiffs will introduce documents

and testimony that Mohawk

**REDACTED**

[16]

[17]

---

[16] For example. Ex. 23 is a          **REDACTED**

               *See* Ex. 24 at          *see also* Exs. 25, 26, 27
               Similarly, Ex. 28 and Ex. 29 are

Ex. 24 at

                    *Id.* at

[17] Ex. 24 at .

          *id.* at

                                                           *id.* at

                              *id.* at

                                                               *id.* at

27

**REDACTED**

[18]

---

**REDACTED**

*id.* at

*id.* at

*id.* at

*id.* at

Ex. 30

**REDACTED**

This common proof supports plaintiffs'

allegations that factors - such as artificial and illegal expansion of the labor supply

– that allow Mohawk to maintain or suppress wage levels have a class-wide effect

on all hourly employees and that Mohawk has in fact long suppressed wage levels

for all hourly employees by using a supply of illegal workers to fill its labor needs.

Mohawk's Rule 30(b)(6) testimony provides similar common proof that

**REDACTED**

Ex. 24 at          .[19]  Plaintiffs intend to prove that Mohawk's use of illegal workers

--------------------------------------

**REDACTED**

Ex. 31, No. 4, at 7-8
("Mohawk's longstanding practice has been to give a GWI of 3% , and its GWI
generally has been 3% each year during the relevant time period. . . .Divisions
commonly distribute the GWI evenly to all hourly workers although exceptions to
this practice have been made on an ad hoc basis.").
[19] Ex. 24 at 134-35

**REDACTED**

to maintain a labor supply sufficient to fill its needs constrains the wages Mohawk

pays. *See De Canas*, 424 U.S. at 356-57 ("acceptance by illegal aliens of jobs on

substandard terms as to wages and working conditions can seriously depress wage

scales and working conditions of citizens and legally admitted aliens").    **REDACTED**

**REDACTED**    is part of the common proof Plaintiffs will use to make that showing.[20]

Plaintiffs will also introduce expert testimony to establish that Mohawk's

unlawful conduct depresses the wages for all class members.  On this point, *Klay*,

holds that a plaintiff seeking class certification "need only come forward with

plausible statistical or economic methodologies to demonstrate impact on a class-

_____

                              **REDACTED**

*see id.* at

[20] *See also* Ex. 32 (quoting former Mohawk CEO David Kolb: "There's no
question that Dalton, Whitfield County and Gordon County have large populations
of immigrants working for these companies, heavily Hispanic in nature.  They've
been excellent workers and really helped the industry survive in a very, very tight
labor situation.").

wide basis," 382 F.3d at 1259.[21]  Plaintiffs have far surpassed that standard  here

by procuring the assistance of Dr. George Borjas, a leading expert on the impact of

illegal immigration on wages, who will testify that fundamental principles of

economics establish that an increase in labor supply caused by the use of illegal

workers negatively impacts wage rates:

> the laws of supply and demand have unambiguous implications about what
> happens to wages in labor markets that receive an influx of illegal
> immigrants.  In particular, Mohawk's alleged practice of hiring illegal
> immigrants would tend to depress the wage that Mohawk pays its workers
> below what would have been observed otherwise.

Ex. 33 ¶ 14.[22]  The Eleventh Circuit has already held that this theory of causation is

sound, and that holding is the law of this case:

> *[I]t has long been recognized that hiring illegal workers on substandard
> wage terms depresses the wage scales of legal workers.*  Moreover,

---

[21] *See In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486-87 (W.D. Pa. 1999)
("[P]laintiffs' expert ... opines that, by using a regression analysis, plaintiffs can
establish the fact of damage for the proposed subclasses. . . . At this point of the
proceedings, it would be improper to make a determination as to the likely success
of using a multiple regression analysis.  Rather, we need only concern ourselves
with whether plaintiffs have identified a valid method for determining damages, as
they have.") (relying on *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D.
677, 692-93 (N.D. Ga. 1991)); *In re Microcrystalline Cellulose Antitrust Litig.*,
218 F.R.D. 79, 93 (E.D. Pa. 2003) ("Plaintiffs, however, have set forth sufficient
evidence and a plausible theory to show they may be able to prove by class-wide
evidence that Asahi's artificial absence from the U.S. market did impact all buyers
of MCC.").

[22] *See also* Ex. 34 ¶ 12 ("this theory [of labor demand] implies that the wage rates
and total wages of legal workers with skills similar to those of illegal workers hired
into the same firm will suffer from the competition.").

> plaintiffs are not suing about the hiring of illegal workers on the west coast
> depressing the wages of legal workers on the east coast.  Rather, plaintiffs'
> complaint is a narrow one about a single employer's – Mohawk's - hiring of
> thousands of illegal workers at its manufacturing facilities in north Georgia
> depressing the wages of legal workers of the same employer, Mohawk, at
> the same manufacturing facilities in the same limited geographical area.
> Accordingly, under the particular factual circumstances of this case, we
> conclude that plaintiffs' complaint satisfies the direct relationship
> requirement imposed by *Holmes* and *Anza*'s interpretation of the "by reason
> of" language in the federal RICO statute.

*Williams*, 465 F.3d at 1290 (emphasis added); *id.* at 1289 ("the Supreme Court has

already recognized a direct correlation between illegal hiring and lower wages").

In addition, Dr. Borjas can examine Mohawk's wage-setting behavior and

conduct a regression analysis to estimate the effect of Mohawk's use of illegal

workers on the earnings of Mohawk's legal workers.  Ex. 33 ¶¶ 15-18 (preliminary

observations about Mohawk's general wage setting behavior); *id.* ¶¶ 19-22

(expected regression analysis).[23]  Dr. Borjas has identified many of the factors that

will likely be included in this analysis and testified that his analytical approach is

consistent with basic principles of econometric theory and constitutes a "standard

approach" in the academic literature.  *Id.* ¶ 19.  The analysis will use merits

evidence that Plaintiffs obtain regarding the extent of Mohawk's use of illegal

---

[23] *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 26 (N.D. Ga. 1997)
("As a general rule, a properly constructed regression analysis 'can play a vital role
in legal proceedings.  Used properly, it is an accurate and reliable method of
determining the relationships between two or more variables, and it can be a
valuable tool for resolving factual disputes.'") (citation omitted).

workers. That evidence, including I-9s and other documents that Mohawk has yet to produce, is common proof upon which every member of the class can rely. Dr. Borjas has opined that through his analysis "individual class member and class-wide damages can be established and calculated on a class-wide basis." *Id.* ¶ 25.[24]

Mohawk undoubtedly will argue that Plaintiffs will fail to prove injury on a class-wide basis. Whether posed as a *Daubert* objection or a merits argument, however, that argument cannot preclude class certification. The Borjas Declaration and the Eleventh Circuit's holding that Plaintiffs' theory of causation is sound establish that the question of injury (like the questions of enterprise, conspiracy and pattern of racketeering activity) is a common question that predominates. Rather than "conclusively prove" the substance of their claims before receiving merits discovery, plaintiffs need only demonstrate that they have a method to prove injury and damages to sustain their burden on class certification. *In re Polypropylene*, 996 F. Supp. at 23-26. And *Klay* holds that "[I]n assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods [for computing damages] are so insubstantial to amount to no method at all[.]" 382 F.3d at 1259.

---

[24] *See also* Ex. 34 ¶ 13 ("the theory and statistical methods of labor economics can be usefully applied to this case" and "will allow me or any other experienced labor economist to measure the impact of the influx of illegal workers on individual legal employees at Mohawk and on those employees as a class.").

Moreover, *Trollinger* and *Mendoza* both rejected the defendants' attempts to defeat class certification on the ground that predominance was lacking because plaintiffs allegedly could not prove injury on a class-wide basis. *See Trollinger*, 2006 U.S. Dist. LEXIS 74114, at **32-35 (rejecting those arguments as premature merits and *Daubert* challenges); *Mendoza*, 222 F.R.D. at 447 (rejecting defendant's claim that predominance was lacking because the impact of illegal hiring would allegedly vary based on factors such as "the site at which the employee worked" and "the type of job he performed"). These decisions in similar cases are consistent with both *Klay* and *In re Polypropylene*, 996 F. Supp. 18 (N.D. Ga. 1997), where this Court refused to conduct a *Daubert*-style inquiry at the class stage and instead considered "whether [the expert's] methodology, as proposed, will comport with basic principles of econometric theory, will have any probative value, and will primarily use evidence that is common to all members of the proposed class." 996 F. Supp. at 26.

These requisites are easily met here. Plaintiffs' proposed methods of proof are plausible, probative and common to the class. Indeed, even in an individual case, a plaintiff would need to use the common proof described above, including economic theory and economic analysis, to establish injury. In sum, Plaintiffs have proffered common proof and proposed "plausible statistical or economic

methodologies" to prove class-wide injury. *Klay*, 382 F.3d at 1259. Nothing more

is required at this stage.

    **d.**    <u>**Individual Issues Relating to Damages Do Not Predominate.**</u>  Any

argument that individual issues relating to damages predominate is unavailing.

The Eleventh Circuit and this Court repeatedly have held that individual damage

issues do not predominate or defeat class certification. In *Klay*, the Eleventh

Circuit stated:

> The defendants point out that individualized determinations are necessary to
> determine the extent of damages allegedly suffered by each plaintiff. While
> this is undoubtedly true, it is insufficient to defeat class certification under
> Rule 23(b)(3). "Numerous courts have recognized that the presence of
> individualized damages issues does not prevent a finding that the common
> issues in the case predominate." *Allapattah Servs. v. Exxon Corp.*, 333 F.3d
> 1248, 1261 (11th Cir. 2003), *reh'g en banc denied*, 362 F.3d 739 (11th Cir.
> 2004); *see, e.g., In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 692 n.20
> (N.D. Ga. 2003) ("The requirement of determination of damages on an
> individual basis does not foreclose a finding of predominance or defeat
> certification of the class.").

382 F.3d at 1259. If this is true for classes of 10,000, as in *Allapattah*, 333 F.3d at

1261, and classes of 600,000, as in *Klay*, it is certainly true here. Moreover,

Plaintiffs will use common proof, including expert testimony and an appropriate

regression analysis, to establish damages for each class member. *In re*

*Polypropylene*, 996 F. Supp. at 29 (proposed use of regression to estimate damages

is common method of proof).

### 2.    A Class Action Is the Superior Method for Adjudicating This Controversy.

Certifying a class is the superior method, indeed the only viable method, for adjudicating this controversy. The alternative against which class certification must be compared – thousands of individual cases in which the same evidence would be used to resolve the same enterprise, pattern of racketeering activity and conspiracy issues – would be a terrible waste of judicial resources. In fact, it is unlikely those thousands of cases would materialize for the worst possible reason: individual workers and attorneys cannot afford the expense and risks entailed in prosecuting individual RICO claims against Mohawk.

That RICO permits recovery of attorneys' fees is no answer to the practical difficulties of individual litigation here. Individual recoveries are likely to be in the four or low five figure range, making it economically unattractive for attorneys to take the risk of litigating individual cases that would require enormous effort and large expert witness fees. *Klay* recognizes that Rule 23's goal of making it economical for individuals to sue "applies in situations where, as here, the amounts in controversy would make it unlikely that most of the plaintiffs, or attorneys working on a contingency fee basis, would be willing to pursue the claims individually. This is especially true when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings

36

for as long as humanly possible and burying their opponents in paperwork and

filings." 382 F.3d at 1271. The lengthy interlocutory journey of this case

demonstrates the relevance of this concern here. As the district court observed in

*Mendoza*: "Absent class certification, it is unlikely that any plaintiff will have an

opportunity to challenge the hiring scheme that the defendants allegedly engaged

in. Preventing such outcomes is one of the reasons Rule 23(b)(3) was adopted."

222 F.R.D. at 449 (citation omitted).

Further, as set forth in *Klay*, when common issues predominate, class

treatment is almost always superior:

> [C]lass actions 'offer[] substantial economies of time, effort, and expense for
> the litigants . . . as well as for the court.' Holding separate trials for claims
> that could be tried together 'would be costly, inefficient, and would burden
> the court system' by forcing individual plaintiffs to repeatedly prove the
> same facts and make the same legal arguments before different courts. . . .
> Where predominance is established, this consideration will almost always
> mitigate in favor of certifying a class.

382 F.3d at 1270 (citations omitted).

With regard to the specific superiority factors set forth in Rule 23(b)(3),

*Klay* is again on point: "There is no reason to believe that the putative class

members in this case have any particular interest in controlling their own litigation,

so the first factor does not counsel against class certification. Similarly, there are

no class members separately pursuing other cases involving the same claims and

parties, so the second specified factor does not aid the defendants, either." *Id.* at

1269 (citation omitted).[25]  "Third, it is desirable to concentrate claims in a

particular forum when that forum has already handled several preliminary

matters." *Id.* at 1271 (footnote and citation omitted).  Here, the Court has already

handled motions to dismiss and class-wide discovery.  Moreover, this case

involves Mohawk facilities located in the Northern District of Georgia.  *See*

*Trollinger*, 2006 U.S. Dist. LEXIS 74114, at *28

Fourth, a class action would be manageable.  As the Eleventh Circuit and

this Court have observed, numerous tools exist to assist courts in addressing any

difficulties that arise in managing class actions.  *Id.* at 1273 (citing *Tri-State*, 215

F.R.D. at 699 n.28).  Thus, a concern about manageability "will rarely, if ever, be

in itself sufficient to prevent certification of a class.  'Courts are generally reluctant

to deny class certification based on speculative problems with case management.'"

*Klay*, 382 F.3d at 1272-73.  Moreover, a class action is certainly more manageable

than thousands of individual actions, which is the relevant comparison:

---

[25] *See also Trollinger*, 2006 U.S. Dist. LEXIS 74114, at **26-27 ("the Court deems the 'interest in individual law suits is minimal in that the class mechanism allows class members for a more effective and far reaching remedy than would be available to them on an individual basis.  As a result, the Court finds this factor weighs heavily in favor of granting Plaintiffs' motion for class certification.") (citation omitted); *id.* at *27 (absence of other litigation "weighs in favor of granting Plaintiffs' motion for class certification").

> First, we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members).

*Id.* at 1273 (citations omitted).

The only two district courts to consider whether similar illegal worker cases are manageable have concluded that they are. In *Mendoza*, the court observed that it "should not be an insurmountable task" for a jury to determine wage depression and damages "if, as seems to be the case, the defendants have records of hours worked by employees and the rates at which the employees were paid." 222 F.R.D. at 447-48. (Here, Mohawk's Infinium and Kronos databases contain such records.) For similar reasons, the court in *Trollinger* was "convinced the Class will be manageable." 2006 U.S. Dist. LEXIS 74114, at *37.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed class.

Respectfully submitted, this 18th day of December, 2007.

Joshua F. Thorpe
Georgia Bar No. 710665
Email: *thorpe@bmelaw.com*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing pleading has been prepared in Times New Roman, 14 point font, as permitted by Local Rule 5.1B.

Joshua F. Thorpe
Georgia Bar No. 710665
Email: *thorpe@bmelaw.com*

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the within and foregoing

**REDACTED BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR**

**CLASS CERTIFICATION** with the Clerk of Court using the CM/ECF system,

which will automatically send email notification of such filing to the following

attorneys of record:

R. Carl Cannon
ccannon@constangy.com

Juan P. Morillo
juan.morillo@cliffordchance.com

Steven T. Cottreau
steve.cottreau@cliffordchance.com

I hereby certify that I have on this day mailed by United States Postal

Service, first-class postage prepaid, the document and Notice of Electronic Filing

to the following non-CM/ECF participants:

Rosemary C. Lumpkins
Constangy, Brooks & Smith, LLC
230 Peachtree Street, N.W.
2400 Peachtree Center Tower
Atlanta, GA 30303

Stephen M. Nickelsburg
Clifford Chance LLP
2001 K Street, N.W.
Washington, DC 20006

Virginia A. Seitz
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005

This 19th day of December, 2007.

/s/Joshua F. Thorpe
Joshua F. Thorpe
Georgia Bar No. 710665