UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| SHIRLEY WILLIAMS, GALE PELFREY, BONNIE JONES and LORA SISSON, individually and on behalf of a class, | ) ) ) ) ) | FILE NO. 4:04-CV-03-HLM |
| Plaintiffs, | ) ) | CLASS ACTION |
| v. | ) ) | |
| MOHAWK INDUSTRIES, INC., | ) ) ) | CONFIDENTIAL - SUBJECT TO COURT ORDER |
| Defendant. | ) ) | **REDACTED VERSION** |

**MOHAWK INDUSTRIES, INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Juan P. Morillo (*pro hac vice*)          R. Carl Cannon
Steven T. Cottreau (*pro hac vice*)       Georgia Bar No. 461029
Matthew B. Hsu (*of Counsel*)             CONSTANGY, BROOKS
Valeria Calafiore (*of Counsel*)          & SMITH, LLC
CLIFFORD CHANCE US LLP                     230 Peachtree Street, N.W.
2001 K Street, N.W.                         2400 Peachtree Center Tower
Washington, D.C. 20006                      Atlanta, GA 30303-1557
(202) 912-5000                              (404) 525-8622

Attorneys for Defendant Mohawk Industries, Inc.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................. 1

FACTUAL BACKGROUND ............................................................ 6

ARGUMENT ..................................................................................... 8

I.  THE PROPOSED CLASS REPRESENTATIVES LACK TYPICAL CLAIMS AND ARE INADEQUATE REPRESENTATIVES. ..................... 8

    A.  Plaintiffs' Claims Are Not Typical ........................................ 8

    B.  Plaintiffs Lack Knowledge. ................................................. 10

    C.  Plaintiffs Have Conflicts With Proposed Class Members. .................... 11

II.  PLAINTIFFS' CLAIMS CANNOT BE LITIGATED AS A SINGLE CLASS. ......................................................................................... 12

    A.  Hiring and Wage-Setting Processes Are Decentralized And Differ Across the Class. ................................................................ 13

    B.  There Is No Evidence of a Single Conspiracy Or Enterprise Affecting the Proposed Class. ............................................... 15

    C.  Plaintiffs' Own Expert Establishes that Proof of Injury Is Not Possible. .......................................................................... 19

III.  ADJUDICATION OF STATUE OF LIMITATIONS DEFENSES REQUIRES THOUSANDS OF INDIVIDUALIZED DETERMINATIONS. ....................................................................... 21

IV.  PLAINTIFFS' HAVE NO VIABLE METHOD FOR DETERMINING WHO IS (OR IS NOT) WORK ELIGIBLE. ................................... 25

V.  CERTIFICATION UNDER RULE 23(b)(2) IS IMPERMISSIBLE. ........... 29

VI.  IF THE COURT DECIDES TO CERTIFY A CLASS, IT SHOULD SUBSTANTIALLY NARROW THE PLAINTIFFS' PROPOSED CLASS DEFINITION. ....................................................................... 30

CONCLUSION ................................................................................ 32

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987)................................................................21

*Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978) ..............15, 18

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998)...................24

*Bradley v. Southern Pacific Co.*, 486 F.2d 516 (5th Cir. 1973)......................9

*Brewer v. Salyer*, 2007 WL 3341479 (E.D. Cal. 2007) ................................27

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) ..........................................................25

*Buford v. H&R Block, Inc.*, 168 F.R.D. 340 (S.D. Ga. 1996), *aff'd*, 117 F.3d 1433 (11th Cir. 1997)........................................................10, 11

*Collier v. Hunt-Wesson Foods, Inc.*, 1976 WL 608 (S.D. Ga. 1976) ............9

*Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004).........................14, 29

*Darvin v. International Harvester Co.*, 610 F. Supp. 255 (S.D.N.Y. 1985).................................................................................11

*DeBremaecker v. Short*, 433 F.2d 733 (5th Cir. 1970) .................................25

*Doll v. Chicago Title Ins. Co.*, ---F.R.D.---, 2007 WL 42484271 (D. Kan. Dec. 2007)..........................................................24

*Fisher v. Ciba Specialty Chem. Corps.*, 238 F.R.D. 273 (S.D. Ala. 2006)..........................................................24

*Franze v. Equitable Assurance*, 296 F.3d 1250 (11th Cir. 2002) .................23

ii

*Gen. Te. Co. of S.W. v. Falcon*, 457 U.W. 17 (1989) ....................................8

*Haynes v. Singer Co.*, 696 F.2d 884 (11th Cir. 1983)..................................28

*Horton v. M.& B. Metal Products Co.*, 1974 WL 340 (N.D. Ala. 1974)........................................................................................................10

*Kilgore v. Georgia*, 305 S.E.2d 82 (Ga. 1983)...........................................16

*Klay v. Humana,* 382 F.3d 1241 (11th Cir. 2004)..........................18, 19, 21

*Love v. Turlington*, 733 F.2d 1565 (11th Cir. 1984) ...................................14

*In re Managed Care Litigation*, 135 F. Supp. 2d 1253 (S.D. Fla. 2001)........................................................................................................16

*Mendoza v. Zirkle Fruit Co.*, 222 F.R.D. 439 (E.D. Wash. 2004) ...........6, 18

*Morrison v. Booth*, 763 F.2d 1366 (11th Cir. 1985) ....................................8

*Murray v. Auslander*, 244 F.3d 807 (11th Cir. 2001) ..................................29

*N.Y. Automobile Insurance v. All Purpose Agency & Brokerage*, 1998 WL 695869 (S.D.N.Y Oct. 6, 1998) .......................................................16

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, 263 F. Supp. 2d 172 (D. Mass 2003).......................................................16

*Pilkington v.United Airlines,* 112 F.3d 1532 (11th Cir. 1997).....................24

*In re Polypropylene Carpet Antitrust Litig.,* 996 F. Supp. 18 (N.D. Ga. 1997) ...............................................................................................19

*Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655 (N.D. Ga. 2001).................................................................................................10, 30

*Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619 (N.D. Ga. 2003).......................................................................................15

*Rotella v. Wood*, 528 U.S. 549 (2000)............................................................22

*Southern Intermodal Logistics, Inc. v. D.J. Powers Co., Inc.*, 10 F. Supp. 2d 1337 (S.D. Ga. 1998) ...............................................................15

*Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311 (4th Cir. 2006)............24

*Trollinger v. Tyson Foods, Inc.,* Docket No. 4:02-cv-23 (E.D. Tenn. 2006).............................................................................................5, 27, 28

*United States v. Chandler,* 388 F.3d 796 (11th Cir. 2004) ...........................16

*United States v. Levine*, 546 F.2d 658 (5th Cir. 1977) .................................15

*United States v. Sutherland*, 656 F.2d (5th Cir. 1981) .................................16

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003) ......................................................................................12

*Wright v. Circuit City Stores, Inc.,* 201 F.R.D. 526, 546 (N.D. Ala. 2001)...............................................................................................9

*Wooden v. Board of Regents of University System of Ga.*, 247 F.3d 1262 (11th Cir. 2001) ..............................................................................10

## STATUTES

Fed. R. Civ. P. 23(b)(2) ..................................................................................29

O.C.G.A. § 16-14-8 .........................................................................................22

## **INTRODUCTION**

Plaintiffs allege that Mohawk Industries, Inc. ("Mohawk") engaged in a massive nine-year RICO enterprise and conspiracy to hire illegal aliens with 31 independent contractors that provide temporary labor to hundreds of companies (including Mohawk).  The alleged purpose of the conspiracy was to pay the legal employees of Mohawk's 71 Northwest Georgia facilities lower wages.  Plaintiffs seek to represent a class consisting of 49,708 members.  Plaintiffs seek to prove their case by relying upon the ability of job applicants to speak English, using isolated internal communications regarding Mohawk's compliance investigations and Hispanic employees, reviewing I-9 Forms,[1] and running Mohawk's employees' Social Security Numbers through government databases.  They seek to prove their damages by relying upon an expert who has spent his entire career arguing that it is impossible to determine the effect of immigration (legal or illegal) on the wages of a concentrated pool of workers such as the proposed class members.

---

[1] I-9 Forms are federal documents that employees and employers must complete for all employees hired after 1986.  In these forms, an employee provides basic information such as name and date of birth.  The employer then completes a portion of the form, including verifying that an employee presented required employment documents that reasonably appeared to be genuine.  See Ex. 16 ¶33.

Plaintiffs' arguments are completely at odds with the facts derived through six months of class discovery,[2] rely on discriminatory and offensive inferences drawn from the racial composition of Mohawk's employees, and rest on proof requiring the illegal use of government databases and the reversal of decades of academic study.

In particular, class discovery established that over the class period: (1) Mohawk used 31 different independent temporary agencies;[3] (2) the proposed class of 49,708 employees worked at 71 different locations in five different autonomous Mohawk Divisions; (3) each Division independently conducted its own hiring, set its employees' wages, and contracted with different temporary

_____

[2] Over the course of class discovery, plaintiffs took numerous depositions, received approximately one million pages of documents, obtained over 26 million electronic database records regarding Mohawk's hourly workforce in Georgia, and acquired approximately 100,000 records regarding Mohawk's relationships with temporary agencies.

[3] As this Court is well aware, the heart of Plaintiffs' theory is that Mohawk and the temporary agencies constitute an enterprise, a required element of their RICO claim. See Compl. at ¶76. As a result, the core issues in the case involve the identity of those temporary agencies; which locations used temporary agencies and when; the hiring processes used by temporary agencies; the amounts paid by Mohawk over time to temporary agencies; the identity of Mohawk personnel that interfaced with the agencies; and the identity of the agencies' personnel that in turn interfaced with Mohawk. It is thus unsurprising that class discovery focused on these issues, with Plaintiffs taking seven depositions on temporary agency issues, seeking written discovery from temporary agencies, and obtaining all of Mohawk's records identifying the temporary agencies it used.

agencies; (4) many locations within Divisions conducted their own hiring and contracted with their own temporary agencies; (5) the Human Resources personnel that conducted the hiring varied over time, by Division, and frequently by location; (6) the temporary agency personnel frequently varied over time, by Division, and by location; (7) plaintiff Bonnie Jones never worked at a Mohawk facility that used temporary agencies; (8) plaintiff Gail Pelfrey is no longer employed by Mohawk; and (9) the proposed class members make on average **Redacted** per hour and receive comprehensive benefits including health care, disability, and life insurance, <u>see</u> Ex. 5 at 166-169; Ex. 15 ¶56. As a result of these facts, Plaintiffs' motion for certification should be denied for five independent reasons.

<u>First</u>, the facts establish that the two proposed class representatives are completely inadequate and lack claims typical of the proposed class members. Ms. Jones has never worked at a Mohawk facility that used temporary agency workers. Accordingly, she has no claim, much less a claim typical of the proposed class. And she has conceded facts that make any conceivable claim time-barred. Ms. Pelfrey's bid also fails. She is a former employee who worked for barely two years at two locations in Mohawk's Home Division (which manufactures products like bath mats and pillows—not carpeting). She is in no position to represent the

interests of workers in a suit seeking equitable relief for which only the approximately 12,500 current employees could have standing.

Second, the facts establish that individual issues will predominate. Mohawk's operations are divided among autonomous Divisions with unique histories. These Divisions hired employees at a minimum of 24 separate locations, employed independent hiring personnel, set their own wages, and used 31 separate temporary agencies. Each Division (and often individual locations) also established separate relationships with individual temporary agencies. Moreover, the proposed class includes 13,667 employees who never worked at a Mohawk location that used temporary labor. These facts will require individualized determinations on the key issues in this case: the use of temporary agencies, hiring of employees, and wages. These facts also establish that Mohawk did not—and could not—engage in a single enterprise or conspiracy that would affect the entire proposed class as is legally required.

Third, the facts establish that individualized issues related to the statute of limitations overwhelm any common issues. Plaintiffs' theory of this case is that Mohawk was willfully blind to illegal hiring based upon obvious facts such as employees' lack of ability to speak English. But, as the Plaintiffs themselves make clear, these facts were equally evident to Mohawk's entire workforce long ago.

That knowledge triggered the statute of limitations and renders almost half of the class' claims stale. Specifically, the statute of limitations clearly bars the claims of approximately 20,584 proposed class members hired prior to January 5, 2000, including those of Ms. Jones.

Fourth, Plaintiffs' proposed method of proof of injury is no method at all. In fact, Plaintiffs' own expert has spent his academic career—until he was retained by Plaintiffs' counsel—arguing that it is impossible to measure the effects of immigrants on a local basis—much less on a single company's local operations. Rather, Plaintiffs' expert has consistently argued that labor economists can only measure the effects of immigration on a national basis. Plaintiffs' own expert's work thus shows that Plaintiffs have no common method of class proof.

Finally, Plaintiffs also have identified no possible—or legal—method of proving which employees are legal and therefore, members of the proposed class.

Indeed, the very cases Plaintiffs rely upon establish why certification is not appropriate here. In Trollinger v. Tyson Foods, Inc., the court certified a class based upon an alleged company-wide scheme. The court substantially relied upon evidence of centralized control gathered in a multi-year Department of Justice criminal investigation and criminal trial against Tyson. In contrast, here the evidence establishes that Mohawk was highly decentralized. Moreover, the

Trollinger plaintiffs—represented by the same counsel as Plaintiffs in this case—have repeatedly failed in their attempts to determine whether just 91 workers were legal—so much so that their case is now in disarray, with plaintiffs moving for a continuance of the trial date and defendants moving to decertify the class.

Similarly, in Mendoza v. Zirkle Fruit—which dealt with far fewer workers—the court refused to certify a case-wide class because the entire class could not have suffered a direct injury attributable to the same RICO enterprise. 222 F.R.D. 439 (E.D. Wash. 2004). Likewise, here, the facts establish that, at most, there could not have been a common, single RICO enterprise and conspiracy making this case unsuitable for class treatment.

Mohawk believes that oral argument would assist the Court in evaluating Plaintiffs' Motion for Certification and therefore respectfully requests that the Court schedule a hearing.

### FACTUAL BACKGROUND

Mohawk is a decentralized manufacturing company that is the product of over fifteen mergers and acquisitions during the last two decades. Ex. 1 ¶¶3-5. Mohawk has 71 Georgia locations covered by the proposed class.[4]  Id. ¶11.

_____

[4] "Location" in Mohawk's records primarily refers to a specific physical building or group of buildings. In a few cases, "location" refers to particular functions, such

Mohawk is organized into Divisions and Groups.  This lawsuit primarily concerns four of its Divisions.[5]  Three Divisions primarily manufacture and distribute carpet: (1) the Yarn Division (which makes yarn); (2) the Residential Division (which makes carpet for residences); and (3) the Operations Division (which includes carpet distribution).  Ex. 1 ¶7.  A fourth Division, the Home Division, makes a variety of products for the home, including pillows, blankets, rugs, and doormats. Id.

Critically, each Division has had its own human resources organization that reports to the Division's management and not anyone at the corporate level.  See Ex. 1 ¶¶12-13, 15.  Each Division generally has operated its own hiring locations (at least 24 in total), which were staffed by different employees who made their own hiring decisions.  Id.  Each Division also has set its own wages,  which varied by Division and by location within each Division.  See Ex. 5 at 13-15.  Each Division (and often individual locations) determined whether and when to use the

_____

as Corporate, which includes tasks such as payroll or accounts payable that span physical locations.  See Ex. 1 ¶11.

[5]  Plaintiffs have excluded Mohawk's other Divisions (Dal-Tile, Unilin, and Padding (located in Tifton)) from the proposed class.  See Mot. at 2.  Additionally, Mohawk's Commercial Division (which manufactures carpet for commercial settings) has only a limited number of locations within the proposed class definition.  See Ex. 1 ¶7.

services of temporary employment agencies and established its own temporary agency relationships.  See Ex. 1 ¶¶19-20; Ex. 6 at 44-45, 48-49.  See also Ex. 1-4.

## ARGUMENT

Plaintiffs fail to establish the fundamental prerequisites for class certification.  "While plaintiffs need not prove the merits of their claims at this stage, they must provide more than bare allegations that they satisfy the requirements of Rule 23 for class certification."  Morrison v. Booth, 763 F.2d 1366, 1371 (11th Cir. 1985) (emphasis added).  Determining whether to certify a class requires "a rigorous analysis" of the particular facts of the case.  Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 161 (1989).  Here, the facts establish that Plaintiffs meet none of the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—nor the requirements of Rule 23(b)(2) and Rule 23(b)(3).

## I.    THE PROPOSED CLASS REPRESENTATIVES LACK TYPICAL CLAIMS AND ARE INADEQUATE REPRESENTATIVES.

### A.    Plaintiffs' Claims Are Not Typical.

Plaintiffs' entire RICO theory depends upon their allegation that Mohawk and the temporary agencies it used constitute a RICO enterprise.  Compl. ¶76.  Ms. Jones, however, never worked at any Mohawk location that used temporary agencies.  Since the beginning of the class period, Ms. Jones has worked at two

Yarn Division facilities: the Eton plant and the Caradon plant. <u>See</u> Ex. 11; Ex. 8 at 4. Neither of those plants used any temporary agency employees during Ms. Jones' tenure. <u>See</u> Ex. 15 ¶51. As a result, Ms. Jones' claims, if any, are not typical of those of the class.

Ms. Pelfrey fares no better. She became a Mohawk employee when the company acquired her prior employer in October 2000. <u>See</u> Ex. 9 at 9; Ex. 12. Mohawk terminated Ms. Pelfrey on November 12, 2002 for abandoning her job without notice. <u>See</u> Ex. 12. A former employee who has not worked at any Mohawk facility in over five years is not an adequate representative of the interests of approximately 14,400 current employees. <u>See</u> Ex. 15 ¶57.

> Former employees, years removed from defendant's work force, are understandably unaware of current employment practices and conditions, and, for just that reason, are found inadequate class representatives, especially when they do not seek reemployment.

<u>Collier v. Hunt-Wesson Foods, Inc.</u>, 1976 WL 608, at *5 (S.D. Ga. 1976) (unpublished).[6] Furthermore, Ms. Pelfrey lacks standing to obtain the equitable

---

[6] <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Bradley v. Southern Pacific Co.</u>, 486 F.2d 516 (5th Cir. 1973) (holding retiree inadequate to represent class embracing current employees). <u>Wright v. Circuit City Stores, Inc.</u>, 201 F.R.D. 526, 546 (N.D. Ala. 2001) ("[T]he court notes that none of the plaintiffs are current employees of defendant; in fact, all left the employ of defendant more than four years ago, and have no ties to defendant or prospect of benefit from the injunctive relief they are seeking. Thus, the court is of the opinion that plaintiffs have failed to satisfy the adequacy of representation requirement under Rule 23(a)(4)." (citations omitted)); <u>Horton v.</u>

relief she seeks on behalf of the class.  Only current employees have standing to bring equitable claims.  <u>See</u> <u>Wooden v. Board of Regents</u>, 247 F.3d 1262, 1283 (11th Cir. 2001) (stating that "to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future."); <u>Reid v. Lockheed Martin Aeronautics Co.</u>, 205 F.R.D. 655, 665 n. 13 (N.D. Ga. 2001) (former employees have no standing to seek injunctive relief).[7]

### B.    <u>Plaintiffs Lack Knowledge.</u>

Plaintiffs are inadequate representatives because they do not have even a basic knowledge of the factual allegations in the Complaint.  "If [a] plaintiff has extremely limited or nonexistent knowledge of the facts, then he is an inadequate class representative."  <u>Buford v. H&R Block, Inc.</u>, 168 F.R.D. 340, 353 (S.D. Ga.

---

<u>M&B Metal Products Co</u>., 1974 WL 340 (N.D. Ala. 1974) (unpublished) (finding proposed plaintiff inadequate because he resigned from employment more than four years prior to the class certification hearing).

[7] Plaintiffs' mistakenly point to the parties' joint stipulation in this case for the proposition that they have standing in all respects.  <u>See</u> Br. at 11-12 & Ex. 12. That joint stipulation was limited, allowing Plaintiffs to move forward even though they sued Mohawk (who never employed them), but instead should have sued their actual employer (which was a Mohawk subsidiary).  In any event, standing is a prerequisite to this court's subject matter jurisdiction and cannot be stipulated to by the parties.

1996) (internal quotation marks omitted), <u>aff'd</u>, 117 F.3d 1433 (11th Cir. 1997).[8]

For instance, Ms. Jones admitted having no personal knowledge about the relationship between Mohawk and the temporary agencies that supposedly supply Mohawk with illegal workers. Specifically, she admitted that "she is not aware of whether recruiting or staffing agencies have recruited or provided workers to any Mohawk facility where she has worked." Ex. 14. She also lacks knowledge about this suit's other basic allegations, including Mohawk's alleged employment of illegal workers, providing and accepting false documents, housing and harboring of illegal workers, or transporting illegal workers to Georgia. <u>See</u> Ex. 8 at 22-23, 27, 28-30, 31-32. 35, 40-41, 63, 70-72. Ms. Pelfrey demonstrated a similar lack of personal knowledge, and placed reliance almost exclusively on rumors and speculation. <u>See</u> Ex. 9 at 53-54, 64-65, 78, 112-113. Given this remarkable lack of knowledge and understanding, Plaintiffs are not adequate representatives.

### C.    **Plaintiffs Have Conflicts With Proposed Class Members.**

Plaintiffs also make clear that their interests are at odds with the interest of legal Hispanic workers, who are members of the proposed class. Plaintiffs (and

---

[8] "This requirement is imposed to avoid vesting unbridled discretion in the class attorney and effectively anointing the class attorney as the class representative." <u>Buford</u>, 168 F.R.D. at 353. <u>See</u>, <u>e.g.</u>, <u>Darvin v. Int'l Harvester Co.</u>, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (plaintiff inadequate where "his deposition demonstrates that his personal knowledge of many of the facts pleaded in the complaint is extremely limited or nonexistent").

their expert) believe that Mohawk's employment of legal Hispanic workers contributed to their damages. <u>See</u> Ex. 8 at 44-46; Ex. 9 at 118-119; Ex. 13. In addition, Plaintiffs believe that Mohawk should have subjected Hispanic employees to a higher scrutiny in the hiring process than non-Hispanic employees. <u>See</u> Ex. 16.

> A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefited other members of the class. In such a situation, the named representatives cannot vigorously prosecute the interests of the class … because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.

<u>Valley Drug Co. v. Geneva Pharm., Inc.</u>, 350 F.3d 1181, 1189 (11th Cir. 2003).[9]

Because of these conflicts, Plaintiffs are not adequate class representatives.

## II.    PLAINTIFFS' CLAIMS CANNOT BE LITIGATED AS A SINGLE CLASS.

Plaintiffs claim that certification of a single class is appropriate because "[t]he facts—Mohawk's hiring and harboring of vast numbers of illegal workers in its facilities in North Georgia—are the same for every class member."  Br. at 3. Plaintiffs are wrong.  As set forth below, there are not common, predominating

---

[9] The <u>Valley Drug</u> court also explained that "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives."  350 F.3d 1190.  As explained below in Section VI, Plaintiffs' own expert suggests that many putative class members may well have benefited from the alleged conduct at issue (<u>see</u> Ex. 15), thus preventing certification of the proposed class.

facts regarding the key issues in this case: hiring, employment verification, relationships with temporary agencies, and wages. Nor is there a viable method of common proof of causation and damages.

A.    **Hiring and Wage-Setting Processes Are Decentralized And Differ Across the Class.**

Mohawk's hiring processes (including the I-9 Form processes) and wage-setting processes have been decentralized and have differed significantly over time, by Division, and by location. The Home, Residential, and Yarn Divisions each maintained separate hiring centers. In total, Mohawk has conducted hiring at over 24 different locations. Ex. 2 ¶6; Ex. 3 ¶¶6, 20; Ex. 4 ¶6. Each hiring location was staffed by different personnel who determined whom to hire and whether applicants were authorized to work in the United States. Ex. 1 ¶¶14-15; Ex. 2 ¶¶7, 9; Ex. 3 ¶¶7, 9, 21, 23; Ex. 4 ¶¶7, 9.

Moreover, Division and local management (and not anyone at the corporate level) determined whether to use temporary agency employees, how many to use, for which positions, at which locations, and for how long. Likewise, Mohawk's Division and local management determined which temporary agencies to retain, negotiated the fees paid to the agencies, and determined whether to terminate a temporary agency relationship. Ex. 1 ¶¶19-20; Ex. 2 ¶¶16-17, 23; Ex. 3 ¶¶16-17, 28-29; Ex. 4 ¶¶15-16. See generally Ex. 6 and Ex. 18.

13

Finally, wages were set independently by each Division and each Division's wages differed.[10] Ex. 1 ¶¶16-18; Ex. 2 ¶¶12-15, 20-22; Ex. 3 ¶¶12-14, 26-27; Ex. 4 ¶¶12-14.  See generally Ex. 5.  Indeed, wages for the same jobs even varied within Divisions.  Ex. 5 at 47.  Plaintiffs' own testimony in this suit indicates that wages vary by location.  Ex. 8 at 48.  As the Eleventh Circuit has recognized,

> Where, as here, class certification was sought by employees working in widely diverse job types, spread throughout different facilities and geographic locations, courts have frequently declined to certify classes….
>
> Since the hiring [and] compensation … decisions at issue were made by different managers in different companies implementing different policies, even if the named plaintiffs established that they were, individually, subjected to [harm], they would not necessarily have established that other class members suffered from the same [harm].

Cooper v. Southern Co., 390 F.3d 695, 715-16 (11th Cir. 2004). See also Love v. Turlington, 733 F.2d 1562, 1564 (11th Cir. 1984) (denying certification of a statewide class based upon "uncontested affidavits presented by the defendant

---

[10] Plaintiffs vastly overstate the role of a corporate-level impact on wages.  Br. 28-29.  Prior to 2002, Corporate had minimal involvement with wage-setting.  Ex. 1 ¶¶16-18.  Even after 2002, Corporate only developed a budgetary cap on annual percentage increases.  The divisions have implemented annual wage increases, subject to budgetary caps.  Ex. 2 ¶¶13-15; Ex. 3 ¶27; Ex. 4 ¶13-14.  Divisions, however, retained complete discretion as to how much to increase their employees' wage within the cap and how to distribute increases amongst it workers, see Ex. 2 ¶¶15, 22; Ex. 3 ¶¶14, 27; Ex. 4 ¶14.  What is even more telling are the facts (discussed above) that Plaintiffs fail to confront in their Brief: the decentralized nature of both hiring decisions (including the Form I-9 process) and the retention of temporary agencies.

which specified that … determinations [were] made on a district-by-district basis, and the findings of diploma eligibility [were] made for each student individually").[11]    For the same reasons, the Court should deny Plaintiffs' motion.

**B.    There Is No Evidence of a Single Conspiracy Or Enterprise Affecting the Proposed Class.**

To certify a single class, it is Plaintiffs' burden to establish that a single conspiracy and enterprise existed among Mohawk and the temporary agencies. See Alabama v. Blue Bird Body Co., 573 F.2d 309, 321-323 (5th Cir. 1978).  They cannot.  Specifically, under Georgia RICO, Plaintiffs must show that Mohawk joined "a conspiracy which itself contain[ed] a common plan or purpose to commit two or more predicate acts."  Southern Intermodal Logistics, Inc. v. D.J. Powers Co., Inc., 10 F. Supp. 2d 1337, 1360-61 (S.D. Ga. 1998).  And to prove a classic wheel conspiracy, in which Mohawk is the hub and the temporary agencies are the spokes, Plaintiffs must show that those "who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise."  United States v. Levine, 546 F.2d 658, 663 (5th Cir. 1977).

---

[11] See also, e.g., Rhodes v. Cracker Barrel Old Country Store, Inc., 213 F.R.D. 619, 670-71 (N.D. Ga. 2003) (Murphy, J.) (denying class certification to Plaintiffs who "challenge[d] a centralized practice of discrimination by Defendant" and finding that "[r]egardless of how Plaintiffs attempt to style their claim, the claim will necessarily require the Court to examine many individual, fact-specific issues, including employment decisions made by different individual local store managers … and any particular factual circumstances relevant to those decisions").

Proving such an agreement will be next to impossible when the hub's dealings with each spoke are independent of each other.  See Kilgore v. Georgia, 305 S.E.2d 82, 90 (Ga. 1983).[12]

Likewise, under federal RICO, without more than a bilateral relationship between one participant and each of the other alleged participants, a single RICO enterprise cannot exist:

> the Court reads this theory to be that a group of commercial third-party entities apparently unrelated to each other who contract on a regular basis with some or all of the Defendants are the enterprise.  The Plaintiffs have not pled a sufficient association between these third-party entities for the purposes of a RICO enterprise.

In re Managed Care Litigation, 135 F. Supp. 2d 1253, 1262 (S.D. Fla. 2001).[13]

Plaintiffs have presented no evidence of a massive, state-wide conspiracy or enterprise between Mohawk and the multiple temporary agencies.  In fact,  the

---

[12] It is more difficult to infer an agreement among these spokes than among the links of a "chain conspiracy" because they are less likely to have a community of interests or reason to know of each other's existence since one spoke's success is usually not dependent on the other spokes' success, but instead on his dealings with the hub.  See United States v. Chandler 388 F.3d 796, 807 (11th Cir. 2004) (rejecting a conspiracy as an impermissible "rimless" wheel "where the spokes … have no knowledge of or connection with any other, dealing independently with the hub conspirator, [and so] there is not a single conspiracy, but rather … as many conspiracies as there are spokes.") (emphasis added).

[13] See also, e.g., United States v. Sutherland, 656 F.2d 1181, 1194-95 (5th Cir. 1981); N.Y. Auto Ins. v. All Purpose Agency & Brokerage, 1998 WL 695869, at *6 (S.D.N.Y Oct. 6, 1998); In re Pharmaceutical Indus. AWP Litig., 263 F. Supp. 2d 172, 184 (D. Mass 2003) (collecting cases).

most basic facts involved in proving a state-wide conspiracy or enterprise—the identities of the participants—illustrates the implausibility of a single state-wide conspiracy or enterprise.  Plaintiffs have never identified the members of the alleged conspiracy or enterprise beyond identifying Mohawk and a single temporary agency—TPS.  Compl. ¶76.  That configuration, however, does not square with the massive class proposed.

Plaintiffs' proposed class includes employees who worked at 71 different Mohawk locations spanning 10 counties (not all of which are contiguous).  Ex. 15 ¶51.  Mohawk hired these workers at over 24 different hiring locations and employed over 150 different Human Resources hourly employees.  Id. ¶55.  Moreover, Mohawk used approximately 31 different temporary agencies.  Id. ¶52.  These temporary agencies were competitors of one another who established their own independent relationships with Mohawk.  These relationships between Mohawk and the temporary agencies were a series of bilateral relationships between Mohawk and each temporary agency that provided Mohawk with temporary workers.  Nothing suggests that all of these temporary agencies coordinated with one another or were otherwise joined a single enterprise or conspiracy.  See generally Ex. 1 ¶21; Ex. 2 ¶18; Ex. 3 ¶¶17, 30; Ex. 4 ¶17; Ex 23.  See also Ex. 17-22.

The alleged conspiracy and enterprise would implausibly involve at least 250 individuals[14] and 32 separate entities spanning at least 9 years and well over 100 physical Mohawk and temporary agency locations.  As set forth in <u>Klay v. Humana</u>, upon which Plaintiffs principally rely, evidence of such disparate conspiracies is not sufficient for certification of the proposed class because "'there would be no evidence linking the different conspiracies to each other in order to establish the one "common" conspiracy.'"  382 F.3d 1241, 1256 (11th Cir. 2004) (quoting <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d 309, 323 (5th Cir. 1978)).[15] Indeed, it was precisely the existence of multiple enterprises that were aimed at workers in different parts of the same company that led the court in <u>Mendoza v. Zirkle Fruit Co.</u> to reject certification of a single class.  222 F.R.D. 439 (E.D. Wash. 2004).  That court explained that despite the fact that the conspiracies

---

[14] This estimate of 250 conservatively assumes that the alleged enterprise and conspiracy only involves hourly (not salaried) Mohawk HR employees and an average of three employees per temporary agency.

[15] The <u>Klay</u> court distinguished <u>Blue Bird</u> because in <u>Klay</u> the geographic scope of each the enterprise participants matched the geographic scope of the class.  <u>See</u> 382 F.3d 1256 ("all of the defendants operated nationwide and allegedly conspired to underpay [proposed class members] across the nation").  The instant case is more analogous to <u>Blue Bird</u>, where there was a mismatch: the proposed class covers all Mohawk locations in Northwest Georgia, but the evidence is that any alleged temporary agency conspiracy could not have reached that far.  <u>See</u>, <u>e.g.</u>, Ex. 15 Table 1 (noting numerous plants that never used temporary agency employees).

involved "the same period of time[,] … a broadly similar objective … and … existed in roughly the same geographic area, a single class could not be supported "given the absence of an allegation (much less evidence) that they were related." Id. at 443. For the same reasons here, the proposed class must be rejected.

### C.  Plaintiffs' Own Expert Establishes that Proof of Injury Is Not Possible.

The Court should deny certification because there is no common method of proving injury or damages. "In assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods for computing damages are so insubstantial as to amount to no method at all." Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004) (internal quotation marks and alterations omitted). The court must ensure that the "methodology, as proposed, will comport with the basic [scientific] principles ..., will have any probative value, and will primarily use evidence that is common to all members of the proposed class." In re Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 26 (N.D. Ga. 1997) (Murphy, J.). "[A]s the party seeking class certification, Plaintiffs have the … burden … to provide sufficient details about [their expert's] proposed … analysis to enable the Court to perform an initial review of the study's methodology." Id.

Plaintiffs attempt to meet this standard by proffering vague expert declarations asserting that proof of wage depression is possible. See Br. Ex. 33-34.

19

However, Plaintiffs' own expert's lifelong body of work establishes that it is not. For over a decade, Prof. Borjas has devoted an enormous academic effort to conclude that the wage effects of immigration (both legal and illegal) cannot be determined at the state and or the local level. According to Prof. Borjas, "the local labor market can adjust in far too many ways to provide a reasonable analogue to the 'closed market' economy that underlies the textbook supply-and-demand framework."[16] According to Prof. Borjas, this is likely due to the fact that labor and capital are mobile within the United States.[17] See Ex. 15 ¶¶16-21. In reaching this conclusion, Prof. Borjas relied upon the work of other labor economists, who could not reliably find that immigration had a local impact on wages. See Ex. 15 ¶¶11-15. Amongst that work is the study of the Mariel Boatlift, which rapidly added 125,000 workers to Miami (a 7 percent increase in workers), but had zero impact on wage levels in the local wage market. See id. ¶17.

Indeed, contrary to Plaintiffs' theories, Prof. Borjas has concluded that "[t]he migration of native workers within the United States, in effect, accomplishes what the immigration flow…could not—a 'spreading out' of additional workers over the

---

[16] George J. Borjas, "The Labor Demand Curve Is Downward Sloping: Reexamining the Impact of Immigration on the Labor Market," Quarterly Journal of Economics 1335, 1339 (Nov. 2003).

[17] George J. Borjas, Heaven's Door 67 (1999).

entire nation" and so "in the end, immigration affected <u>every</u> city, not just the ones that actually received immigrants."[18]    <u>See</u> Ex. 15 ¶16-21.    Inexplicably, Prof. Borjas now maintains that in this case he will be able to do what he and no other labor economist has been able to do: provide a sound measure of the <u>local</u> impact of immigration on wages.   Indeed, he is proposing to measure the impact of one company's alleged hiring of illegal workers on that <u>one company's</u> legal workers. Prof. Borjas' own work establishes that there is no methodology to accomplish such a feat.   <u>See generally</u> Ex. 15.   Prof. Finis Welch—a former collaborator and co-author of Prof. Borjas'—has described Professor Borjas' statements as "astounding." Ex. 15 ¶10.

## III.    ADJUDICATION OF STATUE OF LIMITATIONS DEFENSES REQUIRES THOUSANDS OF INDIVIDUALIZED DETERMINATIONS.

The proposed class also should not be certified because of the complicated, fact-intensive statute of limitations defenses in this case.[19]   Federal civil RICO claims are subject to a four year statute of limitations.   <u>See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.</u>, 483 U.S. 143, 156 (1987).   That limitations period

---

[18] <u>Id</u>. at 67-68.

[19] <u>Klay v. Humana</u>, 382 F.3d 1241, 1254 n.7 (11th Cir. 2004) (a court must consider both "the allegations contained in the complaint <u>and the defenses</u> raised against them.") (emphasis added).

is triggered by the so-called injury discovery rule: "when a plaintiff <u>knew or should have known of his injury</u>." <u>Rotella v. Wood</u>, 528 U.S. 549, 553 (2000) (emphasis added). Under the injury discovery rule "discovery of the injury, not discovery of the other elements of the claim, is what starts the clock." <u>Id.</u> at 555. Thus, the limitations period commenced when each proposed class member knew or should have known of the alleged unlawful workers that gave rise to the claimed wage-depression injury.[20]

Here, Plaintiffs contend that Mohawk was willfully blind to the presence of illegal workers because of factors such as those workers' inability to speak English. <u>See</u> Br. at 7. But if Plaintiffs are correct that it should have been obvious to Mohawk that certain workers were illegal based on factors like English fluency, then it also should have been obvious to the members of the proposed class who interacted with them on a daily basis.

Plaintiffs' own depositions establish both that many class members' claims likely are untimely and that this issue can only be adjudicated by factually intensive examination of each class member's individual knowledge. For example, Plaintiff Jones testified as follows at her deposition:

---

[20] Similar inquiries will also be required on Plaintiffs' Georgia claims. Under the Georgia RICO statute, the statute of limitations is five years. <u>See</u> O.C.G.A. § 16-14-8.

> Q.    … What is the basis for your allegation that Mohawk engaged in the widespread employment of illegal workers?
>
> A.    That they are in all the plants.
>
> ….
>
> Q.    When did Mohawk start hiring illegal aliens, to the best of your knowledge?
>
> A.    It had to be before the raid started.  Probably about '92, end of '92.

Ex. 8 at 74.  See also id. at 11, 36, 37, 39, 42.  Plaintiff Jones thus admits that she knew the factual basis allegedly causing her injury occurred—and was obvious to all—in approximately 1992.  Thus, the statute of limitations on Jones' federal RICO claim may have expired as early as 1996—approximately four years before the filing of this action.[21]

In fact, a review of Mohawk's human resources data indicates that approximately 20,584 employees who fall within the proposed class definition were employed more than 4 years before Plaintiffs filed this action.  See 15 ¶54.  These workers would need to be individually examined to evaluate whether their claims are subject to a statute of limitations defense.

As numerous courts have held, such statute of limitations inquiries preclude class certification because they entail a multitude of fact-intensive, individual

---

[21] Because Jones' claims are time-barred, she also fails to meet the commonality, typicality, and adequacy requirements of Rule 23.  See, e.g., Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002) ("[A] class representative whose claim is time-barred cannot assert the claim on behalf of the class.").

inquiries. See, e.g., Thorn v. Jefferson-Pilot Life Ins. Co. 445 F.3d 311, 320 (4th Cir. 2006) ("Examination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it."); Barnes v. Am. Tobacco Co., 161 F.3d 127, 149 (3d Cir. 1998) ("[W]e believe that determining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification."); Doll v. Chicago Title Ins. Co., 2007 WL 42484271, at *4 (D. Kan. Dec. 6, 2007) ("Application of the statute of limitations and the discovery rule involves consideration of facts unique to each class member."); Fisher v. Ciba Specialty Chem. Corps., 238 F.R.D. 273, 309 (S.D. Ala. 2006) (same).

As these and many other courts have rightly recognized, the thousands of individualized inquiries required to adjudicate the statute of limitations defense in this case—including approximately 20,584 separate depositions and other discovery requests—prohibits class adjudication of the proposed class' claims.[22]

---

[22] Plaintiffs cannot avoid there individual inquiries through theories of avoidance. There is no viable continuing tort theory here—each alleged injury (the potentially low wages) is "the same injury that had been accumulating since" the beginning. Pilkington v. United Airlines, 112 F.3d 1532, 1535-36 (11th Cir. 1997). Similarly, any theory of equitable tolling would require individualized proof. See,

## IV.    PLAINTIFFS' HAVE NO VIABLE METHOD FOR DETERMINING WHO IS (OR IS NOT) WORK ELIGIBLE.

Apparently recognizing a fundamental flaw in this suit, Plaintiffs offer a facially <u>illegal</u> method for determining who is legally authorized to work in the United States.    This presents two problems: (1) the proposed class is not ascertainable, and (2) Plaintiffs offer no method by which to prove their claims.

In "order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."    <u>DeBremaecker v. Short</u>, 433 F.2d 733, 734 (5th Cir. 1970).    Here, Plaintiffs propose to certify a class defined as follows:

> All persons legally authorized to be employed in the United States who are or have been employed in hourly positions by Mohawk Industries, Inc., its  subsidiaries or affiliates in Georgia at any time from January 5, 1999 to the present, other than Excluded Employees.

Mot. at 1-2.

Plaintiffs' primary proposal to determine who is "legally authorized to be employed" is that "<u>the Court can</u> order that Mohawk submit the names and social security numbers of its Georgia hourly workers to the Social Security Administration's free Basic Pilot (or 'E-Verify') matching service."    Br. at 13

---

e.g., <u>Broussard v. Meineke Disc. Muffler Shops, Inc.</u>, 155 F.3d 331, 342 (4th Cir. 1998).

(emphasis added).  Plaintiffs proposals are, however, illegal and cannot establish who is in their proposed class.

Robert C. Divine, the former general counsel of the United States Citizenship and Immigration Service (USCIS), has evaluated Plaintiffs' proposals, including their primary proposal to cause Mohawk to use the federal E-Verify system.  See generally Ex. 16.  He concludes that their proposals cannot be implemented and, in any event, would not determine which workers were work eligible and which were not.  See id. ¶¶10-11.  Among the reasons Mr. Divine cites is that the law only permits an employer to use E-Verify system to check the work authorization of an individual only at the time of hire—not of non-employees, including former employees.  See id. ¶15.  Even if workers could be checked, the databases underlying E-Verify are rife with errors and mistakes, the majority of which falsely indicate that U.S. citizens are not legal.  See id. ¶¶20-24.  This is why, under E-Verify, an employer must agree to a series of procedural safeguards—including contacting each worker flagged—that are designed to prevent an employer from terminating an employee due to erroneous information.  See id. ¶25-26.

In fact, Plaintiffs' counsel unsuccessfully tried to persuade another court in a similar RICO class action lawsuit to compel the same action that Plaintiffs' propose here.  That court rightfully rejected the request:

> Plaintiff seeks an order requiring participation in a government program that is otherwise voluntary for the purpose of authorizing a government agency to create new documents that do not presently exist.  In the absence of compelling authority to the contrary, this Court is not prepared to interpret the discovery rules to provide for such relief.

Brewer v. Salyer, 2007 WL 3341479, at *2 (E.D. Cal. 2007).   Similarly, in Trollinger v. Tyson Foods, Plaintiffs' counsel tried to cause the government itself to run the names through its database, which prompted the United States to intervene and oppose the request, which the court ultimately denied.[23]  See Ex. 25.

Mr. Divine also explains why Plaintiffs' secondary proposals also would fail to provide the court with a method of determining who is legally authorized to work.  These methodologies (to the extent Plaintiffs even describe them with any detail) suffer from flaws that are even worse than those in E-Verify or are only piecemeal in nature.  See Ex. 16 ¶¶27-28.  For example, Plaintiffs suggest that they

---

[23] In fact, according to Plaintiffs' own counsel, E-Verify is not even the best method.  Plaintiffs' counsel, Mr. Foster, recently sought to compel the federal government to produce the immigration files of 91 employees in another case.  Mr. Foster took the position that these immigration files—not the E-Verify records he proposes to use in this case—are the "best evidence" to prove work authorization status.  See Ex. 24 at 2.  A federal district court, however, refused to compel the government to make this "best evidence" available.  See id. at 1.

may rely on Mohawk's internal investigations (Br. at 14), but Mohawk's investigations occur only when Mohawk learns of evidence that a worker may not be legal. Ex. 7 at 102-103. Finally, Plaintiffs proposed reliance on I-9 Forms is equally inadequate. See Ex. 16 ¶29-37. Ultimately, it will not be possible to identify "each person within the description [who] is considered a class member and, as such, is bound by the judgment, whether favorable or unfavorable." Haynes v. Singer Co., 696 F.2d 884, 886 (11th Cir. 1983) (alteration in original).

Plaintiffs' counsel once persuaded another court in Trollinger v. Tyson Foods, Inc. that he could ascertain legal workers from illegal workers. That, however, has proven to be a disaster. In fact, after years of litigation Plaintiffs' counsel has been unable to even determine whether a sample of 91 individuals are legal (let alone the over 49,000 workers at issue here). That unmanageable disaster has led Plaintiffs' counsel to seek a continuance of trial and the defendant to decertify the class. See Ex. 26 & 27. Without any workable plan to ascertain who is in the class and which workers were unauthorized, certification is improper.[24]

---

[24] Even our federal and local governments have a difficult time making a work-eligibility determination in a single case—let along across a workforce of over 49,000 workers in this case. See Ex. 30 (press accounts noting worker at White House who was an illegal alien and police officer who was an illegal alien).

## V.    CERTIFICATION UNDER RULE 23(b)(2) IS IMPERMISSIBLE.

Plaintiffs also seek class certification under Rule 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief … with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs' attempt to certify a class under this rule, however, fails because "certification under section (b)(2) is <u>not</u> proper in 'cases in which the appropriate final relief relates exclusively <u>or predominantly</u> to money damages.'" <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 721 (11th Cir. 2004) (quoting advisory committee notes to Rule 23); <u>Murray v. Auslander</u>, 244 F.3d 807, 812 (11th Cir. 2001). Certification under this rule can only be granted where the monetary relief sought is simply "incidental to the claims for equitable … relief." <u>Cooper</u>, 390 F.3d at 720.  Rule 23(b)(2) certification is not permissible where "plaintiffs seek damages to which they would not be automatically entitled even if Defendants' liability to the class is established." <u>Murray v. Auslander</u>, 244 F.3d 807, 812 (11th Cir. 2001).

In this case, Plaintiffs' bring three claims,[25] two of which do not seek injunctive relief at all.  <u>See</u> Compl., Counts I & III (seeking only "threefold" and "punitive" damages).  These counts constitute the core of Plaintiffs' claims under

---

[25] Plaintiffs' fourth claim (Count IV) for unjust enrichment has been dismissed.

the federal and Georgia RICO statutes.  Plaintiffs only seek injunctive relief for one count arising under state law, in which they also seek "punitive damages."  <u>See</u> Compl., Count II, ¶¶97-98.  As the Complaint makes clear, monetary damages predominate, and none of the monetary damages are merely incidental to equitable relief.[26]

## VI.  IF THE COURT DECIDES TO CERTIFY A CLASS, IT SHOULD SUBSTANTIALLY NARROW THE PLAINTIFFS' PROPOSED CLASS DEFINITION.

The Court should deny class certification.  If the Court, however, decides that certification were appropriate, it should substantially narrow Plaintiffs' proposed class definition in these respects:

**<u>Location Limitation</u>**:  As this Court in <u>Cracker Barrel</u> recognized, decentralized decisionmaking across many facilities is inconsistent with the certification of a single class of all of the defendant's workers.  Like the Court in <u>Zirkle</u>, the Court should consider certifying only a single sub-class of hourly workers who worked at the two locations where Ms. Pelfrey worked (the Home Division's Printed Rug facility and Scattered Rug facility) during the timeframes

---

[26] Certification under Rule 23(b)(2) is also inappropriate because the putative class includes numerous former employees, including Ms. Pelfrey, who have no entitlement to equitable relief.  <u>See</u>, <u>e.g.</u>, <u>Reid v. Lockheed Martin Aeronautics Co.</u>, 205 F.R.D. 655, 665 n. 13 (N.D. Ga. 2001)

that she worked there.[27]  (There is no viable sub-class for Ms. Jones because, for among other reasons discussed above, she never worked at a facility with temporary agency employees.)  Without a location limitation, the class would include approximately 13,500 workers who, like Ms. Pelfrey, who never even worked at a facility with temporary labor.  See Ex. 15 ¶53.

**Exclusion of Skilled and Administrative/Clerical Workers**:  According to Plaintiffs' expert, Prof. Borjas, office workers like administrative and clerical workers (who predominantly have at least a high school education) do not suffer wage depression as a result of unlawful hiring and actually may experience an increase in wages.  Ex. 15 at ¶¶42-43.  Similarly, skilled workers (such as electricians and machine technicians) fall within the proposed class, despite the fact that Dr. Borjas' work suggests that these skills insulate them from any immigration-related wage depression.  Id. ¶¶44-45.  Accordingly, the definition should exclude these administrative/clerical and skilled workers (identified in

---

[27] From January 8, 2001 until her termination on November 5, 2002, Ms. Pelfrey worked primarily at the Printed Rug facility on South Industrial Drive in Calhoun. Ex. 12.  For about five weeks from November 12 to December 17, 2001, Ms. Pelfrey worked at Scatter Rug Finishing and Distribution Center, also located on South Industrial Drive.  Ex. 12.

Because Ms. Jones never worked at a facility that used temporary agencies or recruiters for hourly positions during her employment during the class period, sub-classes for her work locations is not appropriate.

Mohawk's workforce database as non-exempt (as opposed to hourly) or having EEO Occupational Codes 5, 6 or 7).[28]

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Class Certification should be denied in its entirety.

Dated: January 30, 2008                    Respectfully submitted,

                                           /s/ R. Carl Cannon
                                           R. Carl Cannon
                                           Georgia Bar No. 461029
                                           Counsel for Mohawk Industries, Inc.

---

[28] The Court should also clarify an ambiguity in the class definition: when the determination is made as to whether an employee is "legally authorized to be employed in the United States." Specifically, it is not clear whether the worker need be authorized today (but not in the past), in the past (but not today), or throughout the class period.

# **CERTIFICATE OF COMPLIANCE**

Pursuant to rule 7.1D of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing pleading has been prepared with Microsoft Word 2000 using Times New Roman, 14 point font, as permitted by Local Rule 5.1B.

/s/ R. Carl Cannon
R. Carl Cannon
Georgia Bar No. 461029
Counsel for Mohawk Industries, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 30, 2008, I electronically filed Redact Version of Mohawk Industries, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:  Bobby Lee Cook, John Earl Floyd, Howard Foster, Matthew Daniel Thomas, Joshua F. Thorpe, Nicole G. Iannarone, and Ronan P. Doherty.


s/  R. Carl Cannon
R. Carl Cannon
Georgia Bar No. 108000
Attorney for Defendant Mohawk Industries, Inc.

CONSTANGY, BROOKS & SMITH, LLC
Suite 2400
230 Peachtree Street, N.W.
Atlanta, Georgia 30303-1557
Telephone:  (404) 525-8622
Facsimile:  (404) 525-6955
E-mail:  ccannon@constangy.com

**Error! Unknown document property name.**