IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

Shirley Williams,
Gale Pelfrey,
Bonnie Jones, and
Lora Sisson, individually
and on behalf of a class,

     Plaintiffs,

v.

Mohawk Industries, Inc.,

     Defendant.

CIVIL ACTION FILE
NO. 4:04-CV-0003-HLM

## ORDER

This is a class action alleging violations of the federal and Georgia Racketeer Influenced Corrupt Organizations Acts.  The case is before the Court on Plaintiffs' Motion for Class Certification [174].

AO 72A

(Rev.8/82)

# I.    Background

## A.    Factual Background

### 1.    The Parties

Plaintiff Shirley Jane Williams resides in Rome, Georgia. (Dep. of Shirley Jane Williams at 4, 129.) From 1999 through 2003, Plaintiff Williams was employed by Defendant, first at a printing plant and then at a warehouse. (Id. at 6-7, 137.) Plaintiff Williams previously worked for Crown Craft, which Defendant bought. (Id. at 8-9, 132-33.)

Plaintiff Bonnie Jones is a resident of Chatsworth, Georgia. (Dep. of Bonnie Jones at 3.) Plaintiff Jones has been employed by Defendant for fourteen years, most recently working as a creeler at Defendant's Caradon location. (Id. at 3-5; Def.'s Resp. Mot. Class Certification Ex. 11.)

AO 72A

(Rev.8/82)

Plaintiff Gale Pelfrey resides in Rome, Georgia. (Dep. of Gale Pelfrey at 4.) From 1998-2001, Plaintiff Pelfrey worked at Crown Craft, which Defendant acquired in 2001. (Id. at 6, 9.) After Defendant acquired Crown Craft, Plaintiff Pelfrey worked at a warehouse and then at a print plant. (Id. at 11-12; Def.'s Resp. Mot. Class Certification Ex. 12.) In 2002, Defendant terminated Plaintiff Pelfrey's employment for job abandonment. (Def.'s Resp. Mot. Class Certification Ex. 12; Pelfrey Dep. at 6.)

Defendant is a Delaware corporation with its principal place of business in Calhoun, Georgia. (Compl. ¶ 9.) Defendant is the second-largest carpet and rug manufacturer in the United States. (Id. ¶ 2.) From January 1, 1999, to the present, Defendant, through its wholly-owned subsidiaries, has employed more than 1,000 hourly

3

workers who are authorized to work in the United States. (Def.'s Objs. & Resps. Pls.' Second Req. Admis. No. 4; Def.'s Objs. & Resps. Pls.' First Interrogs. No. 2.)

## 2.    Defendant's Organization

Defendant has employees in all fifty states, including Georgia. (Decl. of Jerry L. Melton ¶ 9.) From 1999 through 2000, Defendant completed twelve mergers and acquisitions. (Melton Decl. ¶ 3; Dep. of Mark Dailey at 12-13.) Defendant acquired the following companies: (1) Horizon Industries; (2) Karastan; (3) American Rug Craftsmen; (4) Aladdin Mills; (4) Galaxy Carpet Mills; (5) Diamond; (6) World Carpets; (7) Newmark & James; (8) American Weavers; (9) Image Industries; (10) Durkan Patterned Carpets; and (11) Crown Craft. (Melton Decl. ¶ 3; Dailey Dep. at 12-13.)    Since 2000, Mohawk has

4

completed five mergers and acquisitions, including: (1) Dal-Tile; (2) Lees; (3) Wayntex; (4) Unilin; and (5) Columbia Flooring.  (Melton Decl. ¶ 4; Dailey Dep. at 12-13.)

As a result of its rapid expansion, Defendant's operations are highly decentralized in nature. (Melton Decl. ¶ 5; Dailey Dep. at 14, 181, 198.)  Consequently, primary operational and human resources responsibility for Defendant's facilities and workforce exists at the location level and the divisional level. (Melton Decl. ¶ 5; Dailey Dep. at 14-15, 181, 198.)  Until 2002, Defendant's corporate human resources department primarily focused on benefits. (Melton Decl. ¶ 6.)

Since 1999, Defendant has divided its operations into divisions, each of which have separate responsibilities and business objectives.  (Melton Decl. ¶ 7.)  Since 1999,

5

Defendant has had eight principal divisions. (Id.) Five of those divisions are included within Plaintiffs' proposed class definition, including: (1) the Residential Division; (2) the Commercial Division; (3) the Yarn Division; (4) the Operations Division; and (5) the Home Division. (Id.) Defendant's other divisions include the Unilin Division, the Dal-Tile Division, and the former Padding Division, all of which are excluded from Plaintiffs' proposed class definition. (Id. ¶ 8.) Subject to conditions and approvals, Defendant has permitted some employees to transfer between its divisions. (Def.'s Objs. & Resps. Pls.' Second Req. Admis. No. 17.)

Defendant's Residential Division primary manufactures carpet for installation in homes and apartments. (Melton Decl. ¶ 7.a; Decl. of Michael O'Neill ¶ 3.) The Residential

6

Division includes the operations at approximately two dozen different locations, including numerous locations that Defendant has acquired through acquisitions and mergers. (Melton Decl. ¶ 7.a; O'Neill Decl. ¶ 5.)

Defendant's Commercial Division manufactures carpet for installation in commercial buildings, such as offices and hotels. (Melton Decl. ¶ 7.b.) Plaintiffs' proposed class definition includes only a few locations within the Commercial Division. (Id.)

Defendant's Yarn Division manufactures yarn for use in carpet and rug manufacturing. (Melton Decl. ¶ 7.c; Decl. of Jerry Hendrix ¶ 3.) The Yarn Division includes the operations of approximately fifteen different locations within Georgia, and consists of many locations that Defendant acquired in mergers and acquisitions. (Melton Decl. ¶ 7.c;

7

Hendrix Decl. ¶¶ 3, 5.) In 2005, Defendant combined the Yarn Division with the Residential Division. (Melton Decl. ¶ 7.c.)

In 2005, Defendant created the Operations Division. (Melton Decl. ¶ 7.d; O'Neill Decl. ¶ 19.) The Operations Division consists of a number of shared service and support functions that previously existed primarily within the Residential Division. (Melton Decl. ¶ 7.d; O'Neill Decl. ¶ 19.) Those functions included a national transportation and distribution network, including warehouses, extrusion, and creation of carpet samples. (Melton Decl. ¶ 7.d; O'Neill Decl. ¶ 19.)

In 1999, Defendant created its Home Division by aggregating the operations of three companies Defendant had acquired: American Rug Craftsmen, American

8

Weavers, and Newmark & James.  (Melton Decl. ¶ 7.e; Decl. of Patti D. Silver ¶ 4.)  In 2000, Defendant acquired Crown Craft, which in turn became part of the Home Division.  (Silver Decl. ¶ 4.)  Defendant's Home Division primarily manufactures products for use in homes, such as pillows, blankets, bath mats, and rugs. (Melton Decl. ¶ 7.e.) Since 1999, the Home Division has included the operations of over two dozen different locations.  (Silver Decl. ¶ 5.)

Each of the five divisions at issue in the proposed class definition has its own management structure in charge of operations at each location within each division.  (Melton Decl. ¶ 12.) Each division also has its own Division Director of Human Resources, who is responsible for human resources for the division.  (Id.)  From 1999 through 2007, the Division Directors of Human Resources have reported

9

directly to the operational management within their respective divisions. (Melton Decl. ¶ 12; O'Neill Decl. ¶¶ 4, 19; Hendrix Decl. ¶¶ 4, 19.)  The Division Directors of Human Resources did not report directly to the corporate Vice President of Human Resources, but instead simply had an informal, "dotted line" relationship with that individual. (Melton Decl. ¶ 13; O'Neill Decl. ¶¶ 4, 19; Hendrix Decl. ¶ 19.) The Division Directors of Human Resources consulted with the corporate Vice President of Human Resources, but ultimately had the power to decide issues concerning hiring procedures, employee discipline, wages, and the use of temporary agencies at the division level.  (Melton Decl. ¶ 13.)

Defendant also organizes some of its functions into two Groups that exist outside of the division structure.  (Melton

10

Decl. ¶ 10.) The Sales & Marketing Group handles sales to, and relationships with, Defendant's customers. (Id.) The Corporate Group provides shared administrative and management functions across Defendant's company, including executive management, accounts payable, accounts receivable, and information systems. (Id.) Hourly workers employed in the two Groups primarily are administrative and clerical employees who work in office environments. (Id.)

During the proposed class period, Defendant had approximately seventy-one locations within Georgia that fall within Plaintiffs' proposed class definition. (Melton Decl. ¶ 11.) Defendant assigns a unique location number to each of its locations, and uses that number to identify the location. (Id.) Although most locations refer to a single

11

physical site, a location infrequently may refer to a number of buildings that are geographically close to one another. (Id.) Additionally, a single physical site may have more than one assigned location number. (Id.) Moreover, a few location numbers do not strictly correspond to a physical location, but instead refer to a function that may be spread across a number of physical sites. (Id.)

### 3.    Defendant's Hiring Practices

From 1999 through 2007, each of Defendant's divisions generally hired its own employees at its own hiring locations. (Melton Decl. ¶ 14; O'Neill Decl. ¶ 6.) Each division had its own human resources personnel, who had responsibility for hiring employees, including verifying employment eligibility and completing I-9 forms. (Melton Decl. ¶ 14.) Each division's human resources personnel

12

reported to that division's operational management.  (<u>Id.</u>) Defendant's corporate-level personnel had no responsibility for divisional employment decisions, including hiring and disciplining employees.  (<u>Id.</u> ¶ 15.)

For example, from 1999 through 2005, the Residential Division maintained its own separate hiring locations for hourly employees, and conducted its hiring primarily at four county hiring centers. (O'Neill Decl. ¶ 6.)  From 2005 to the present, the Residential Division has conducted its hiring at five county hiring centers, and locations within the Residential Division that fall outside those counties conduct their own hiring.  (Hendrix Decl. ¶ 20.)  With one minor exception, the Residential Division's hiring locations did not hire employees for Defendant's other divisions or groups. (O'Neill Decl. ¶ 6.)  Human resources personnel within the

13

Residential Division, rather than Defendant's corporate headquarters ran the hiring centers. (O'Neil Decl. ¶ 7; Hendrix Decl. ¶ 21.) Those personnel, in conjunction with management at plants within the Residential Division, determined which applicants to hire and for which jobs and shifts. (O'Neill Decl ¶ 7; Hendrix Decl. ¶ 21.) Applicants for jobs within the Residential Division applied for jobs within that division and not for jobs with Defendant in general. (O'Neill Decl. ¶ 8; Hendrix Decl. ¶ 22.)

Employees of the Residential Division were responsible for completing I-9 forms. (O'Neill Decl. ¶ 9; Hendrix Decl. ¶ 23.) The management of the Residential Division determined whether to discipline, including whether to terminate, its hourly employees. (O'Neill Decl. ¶ 10; Hendrix Decl. ¶ 24.)

14

AO 72A

(Rev.8/82)

Similarly, from 1999 through 2005, Defendant's Yarn Division maintained and managed its own separate hiring locations for hourly employees, and conducted its own hiring at each of its approximately fifteen locations. (Hendrix Decl. ¶ 6.)  Those hiring locations did not hire employees for Defendant's other divisions or groups.  (Id.) The Yarn Division's personnel, including human resources personnel, ran the hiring locations and determined which applicants to hire and for which jobs and shifts.  (Id. ¶ 7.) Applicants who sought jobs within the Yarn Division applied for jobs within that division and not for jobs with Defendant in general.  (Id. ¶ 8.)  The Yarn Division employees were responsible for competing the I-9 forms. (Id. ¶ 9.) The Yarn Division's management also determined whether to

15

discipline, including whether to terminate, the Yarn Division's hourly employees. (Id. ¶ 10.)

The Home Division also maintains its own separate hiring locations for hourly employees. (Silver Decl. ¶ 6.) From 1999 through 2007, the Home Division conducted its hiring for its plants in Gordon County, Georgia, at a hiring center in Calhoun, Georgia, and for its plants in Whitfield County, Georgia, at a hiring center in Dalton, Georgia. (Id.) Home Division plants located in Jasper and Hiawassee, Georgia, did their own hiring. (Id.) The Home Division's hiring locations have not hired employees for Defendant's other divisions or groups. (Id.) Applicants who seek jobs within the Home Division complete applications for jobs within that division, and not for jobs with Defendant in general. (Id. ¶ 8.)

16

Home Division employees ran the Home Division's hiring centers. (Silver Decl. ¶ 7.) Home Division human resources personnel operated the hiring centers in Calhoun and Dalton, while individual plant managers at the Hiawassee and Jasper plants oversaw hiring at those locations. (Id.) Those personnel determined which applicants to hire and for which jobs and shifts. (Id.) Those personnel also were responsible for completing the I-9 forms. (Id. ¶ 9.) The Home Division's management determines whether to discipline, including whether to terminate, its hourly employees. (Id. ¶ 10.)

Defendant generally does not take language into consideration when determining whether to hire someone for employment, unless the job requirements make it necessary for the employee to have the ability to speak and

write English.  (Dep. of Matthew B. Brown Dated Aug. 30, 2007 ("Brown Dep. III") at 52, 63-64.)

Defendant contends that its human resources department follows the law with respect to completing I-9 forms, and that Defendant does not knowingly allow an employee who is not eligible to work in the United States to work for it.  (Brown Dep. III at 54, 102.)  Defendant uses good faith efforts to collect and maintain I-9 forms consistent with all applicable laws and regulations, and denies the remainder of the request. (Def.'s Objs. & Resps. Pls.' Second Req. Admis. No. 11.)

Defendant does not distribute materials to its human resources personnel in its different divisions concerning completing I-9 forms.    (Brown Dep. III at 55-57.) Government documents, however, are available to assist in

18

completing I-9 forms. (<u>Id.</u> at 56.)   Defendant does not use the SSA's Basic Pilot System. (<u>Id.</u> at 90.)

If Defendant has questions concerning an applicant's eligibility for employment, Defendant investigates and resolves those questions before allowing the applicant to work for Defendant. (Brown Dep. III at 98-99.) Similarly, if Defendant receives information from the SSA reporting a "no match" between the employee's name and social security number, Defendant will review the employee's employment eligibility. (<u>Id.</u> at 103.) Defendant also has a practice of investigating questions and complaints concerning eligibility to work in the United States that come to Defendant's attention. (<u>Id.</u> at 100, 102-03.) Defendant, however, does not have a written policy describing its investigation process. (<u>Id.</u> at 100.) A report presented by

19

AO 72A

(Rev.8/82)

Plaintiffs indicates that, during the period from January 2006 through August 2006, Defendant terminated some employees for discrepancies on work documents. (Pls.' Mot. Class Certification Ex. 17.)

### 4. Defendant's Use of Temporary Employment Agencies

Defendant has ongoing relationships with employment agencies who supply Defendant with temporary employees ("temporary employment agencies"), and most of Defendant's day-to-day interactions with temporary employment agencies are informal and occur without a written agreement. (Dep. of Matthew Brown Dated Aug. 23, 2007 ("Brown Dep. II") at 53; Def.'s Objs. & Resps. Pls.' First Interrogs. No. 10; Dep. of Kenneth Glenn Michaels at 46-47, 50, 52; Dep. of Catherine Stuff at 11, 31; Decl. of Catherine Waring Stuff ¶ 5; Dep. of Ginger Talley at 11;

AO 72A

(Rev.8/82)

Dep. of Barbara Waters at 22-24.)  The decisions as to whether to use temporary employment agencies and which temporary employment agency to use generally are left to the discretion of local human resources managers, with approval from the human resources directors of their particular divisions.  (Brown Dep. II at 44-45, 48, 50, 53; Def.'s Objs. & Resps. Pls.' First Interrogs. No. 10; O'Neill Decl. ¶¶ 16-17, 23; Hendrix Decl. ¶¶ 15-16, 28-29; Silver Decl. ¶¶ 15-16.)  Specifically, since 1999, each division has had authority to determine whether, and to what extent, to use the services of temporary agencies' employees. (Melton Decl. ¶ 19; O'Neill Decl. ¶¶ 16-17, 23; Hendrix Decl. ¶¶ 15-16, 28-29; Silver Decl. ¶¶ 15-16.)

Each division also has authority to determine which temporary agencies to use and to enter into, and to

21

negotiate, fee agreements with those agencies. (Melton Decl. ¶ 19; O'Neill Decl. ¶¶ 17, 23; Hendrix Decl. ¶¶ 15-16, 28-29; Silver Decl. ¶¶ 15-16; Brown Dep. II at 57-60.) Defendant's division management determines whether to discontinue use of a particular temporary agency or to discontinue the use of temporary employees for particular jobs or at particular locations. (O'Neill Decl. ¶¶ 17, 23; Hendrix Decl. ¶¶ 16, 29; Silver Decl. ¶ 16.) No one at Defendant's corporate level is responsible for temporary agency employees working within the divisions or for the divisions' relationships with temporary agencies. (Melton Decl. ¶ 20.)

Similarly, evaluations as to performance of temporary employment agencies generally occur at the division or site level. (Brown Dep. II at 68.) Such evaluations include

22

consideration of whether the agencies are meeting their obligations to provide temporary employees who report to work on time, who are of good quality, who can perform the work they are sent to perform or learn to do so, who follow safety rules, and who do not cause high "turnover." (Id. at 68.)

Orders for temporary workers generally are placed by the human resources personnel, or by other supervisory personnel, at Defendant's various plants. (Michaels Dep. at 52-53, 59; Dep. of Cheryl Johannsen at 21-22; Talley Dep. at 20; Waters Dep. at 35-37; Stuff Dep. at 38, 62-63.) The temporary agencies ordinarily set the wage rates to be paid by Defendant to the temporary employees. (Michaels Dep. at 55-58; Stuff Dep. at 17-18, 70; Talley Dep. at 12-14; Johannsen Dep. at 24; but see Waters Dep. at 34 (stating

23

that Defendant set wages to be paid to temporary employees).)

Defendant requires that the temporary employment agencies perform drug screens and background checks on the temporary employees to be provided to Defendant. (Brown Dep. II at 63, 65; Johannsen Dep. at 14-15; Michaels Dep. at 64-65; Stuff Dep. at 44, 48.) Defendant also requires that the temporary employment agencies complete I-9 forms accurately. (Brown Dep. II at 63, 79-80; Michaels Dep. at 20; Stuff Dep. at 75, 77; Waters Dep. at 24-25, 62.)

Temporary agencies send invoices to Defendant's human resources departments, generally at the divisional level. (Dailey Dep. at 233-36; Brown Dep. II at 179; Johannsen Dep. at 26; Waters Dep. at 73-74; Stuff Dep. at

24

39, 65-66.) Defendant's human resources employees verify the hours claimed on the invoices, and forward the invoices to Defendant's accounts payable department. (Dailey Dep. at 233-36; Brown Dep. II at 179.) Defendant's accounts payable department pays the invoices. (Dailey Dep. at 233-36; Brown Dep. II at 179.)

### 5.   Defendant's Wage-Setting Practices

Since 1999, each of Defendant's divisions has set wages and has independently determined the wages of its hourly employees. (Melton Decl. ¶ 16; O'Neill Decl. ¶¶ 12, 20; Hendrix Decl. ¶¶ 12-13, 26-27; Silver Decl. ¶ 12.) Defendant and its various divisions have used Wage Progression Tables ("WPTs") to determine wages to be paid to employees. (Dep. of Matthew Brown Dated August 17, 2007 ("Brown Dep. I" at 24.) Defendant's Residential,

25

Commercial, and Home divisions each have their own WPTs. (Brown Dep. I at 19, 24-25, 99, 102; Melton Decl. ¶ 16.) The divisions use their respective WPTs to determine the wages to be paid to employees within those divisions for particular jobs. (Brown Dep. I at 25.) Wages paid for a given job may differ from facility to facility or from division to division. (Id. at 20, 47.)

The number of wage steps for each job, and the timing of the progression through those steps, differ by division. (Melton Decl. ¶ 16.) The starting and top pay rates for hourly positions differ by division, and also frequently differ between the Georgia locations within each division. (Id.)

The WPTs list salary grades. (Brown Dep. I at 28.) The salary grades for companies acquired by Defendant generally were in place when Defendant acquired those

companies, and Defendant continued to use those salary grades after it acquired the companies. (Id. at 14, 28, 85; O'Neill Decl. ¶ 13; Silver Decl. ¶ 13.)

In exceptional circumstances, some managers may provide for certain employees to receive hourly rates that exceed the top rates established by the applicable WPT for the employees' positions and divisions. (Brown Dep. I at 79, 83.) Generally, however, the top rate listed on the WPT for a given job within a given division is the top rate that an employee within that division will receive for performing that job. (Id. at 84.)

Defendant ordinarily provides for an annual general wage increase ("GWI") to its total budget allocation for annual wages on an annual basis. (Brown Dep. I at 29; Def.'s Objs. & Resps. Pls.' First Interrogs. No. 4.)

27

Defendant's corporate Human Resources department establishes the annual GWI, which generally is three percent per year, and communicates that increase to the divisions. (Brown Dep. I at 67-68; Def.'s Objs. & Resps. Pls.' First Interrogs. No. 4.) Each division, in turn, decides how to implement the GWI and whether to give employees in that division the full GWI for a given year. (Brown Dep. I at 79, 108; O'Neill Decl. ¶ 14; Hendrix Decl. ¶¶ 13-14, 26-27; Silver Decl. ¶ 14.) Defendant generally anticipates that its divisions will administer the GWI as an across-the-board increase for all hour employees within that division. (Pls.' Mot. Class Certification Ex. 30 at 1.) The presidents and human resources directors of each division, however, retain the discretion to allocate the GWI as they see fit within their divisions, subject to a budgetary cap. (Def.'s Objs. &

28

Resps. Pls.' First Interrogs. No. 4; O'Neill Decl. ¶¶ 15, 21-22; Hendrix Decl. ¶¶ 13-14, 26-27; Silver Decl. ¶ 14.)

The wage rates for given job grades generally will increase with GWI. (Brown Dep. I at 67-68, 86.) Outside of GWI, Defendant makes no changes or adjustments to the wage rates for given job grades. (Id. at 29.)

When evaluating its wage rates, Defendant considers employee turnover and the available applicant pool. (Brown Dep. I at 133-35.) When setting wage rates for a given position, Defendant also considers factors such as the relevant labor market, the nature of the position, the skill required to perform the position, and the employee's experience and tenure. (Def.'s Objs. & Resps. Pls.' First Interrogs. No. 4.) Wage rates for a given position generally are determined at the division level or local facility level.

29

(Id.; Brown Dep. I at 13, 15.)    Generally, as long as Defendant receives enough applicants to fill its positions, Defendant believes that its wages are competitive.  (Brown Dep. I at 134.)

In 2002, Defendant created a corporate compensation department led by a Director of Compensation, who reports directly to Defendant's corporate Vice President of Human Resources.    (Melton Decl. ¶ 17.)    The corporate compensation department has not played a significant role in setting hourly wages for Defendant's employees, but instead principally has focused on the wages of salaried employees.    (Id.)    The Director of Compensation has evaluated hourly wages for administrative and clerical jobs, and has established recommended wage ranges for those positions.  (Id. ¶ 18.)  The management of each division,

30

however, has authority to deviate from those recommended wage ranges for administrative and clerical employees. (Id.)

### 6.   Defendant's Records

Defendant admits that it has records of, or is able to determine, the aggregate amount of time worked by a Georgia hourly employee within a larger time frame. (Def.'s Objs. & Resps. Pls.' Second Req. Admis. No. 8.) Defendant further admits that it has records of, or is able to determine, the aggregate amount of monetary compensation paid to a Georgia hourly employee over the course of a period of time. (Id. No. 9.)  Defendant admits that it collected, and has maintained, the names and social security numbers, or other government identification numbers, of its Georgia hourly workers.  (Id. No. 13.) Additionally, Defendant has admitted that it has collected

31

and maintained some data regarding the monetary compensation paid to Georgia hourly employees. (Id. No. 14.)

Since 1997, Defendant's human resources personnel have used an Infinium system, which stores human resources data concerning permanent employees. (Dep. of Mark Dailey at 224.) The information stored in that system includes the employees' names, social security numbers, job titles, hire dates, and termination dates. (Id. at 225.)

### 7. Plaintiffs' Evidence Concerning Defendant's Alleged Employment of Illegal Immigrants or Alleged Notice of Use of False Social Security Numbers or Documentation

#### a. Testimony of the Named Plaintiffs

##### i. Plaintiff Williams

Plaintiff Williams testified that her supervisor, Roy

32

Bennett, frequently stated that he could get "illegals" to come in and do the jobs that Plaintiff Williams and her co-workers performed. (S. Williams Dep. at 14-15, 35-36, 50, 52, 53, 135, 140-41, 145-46.) Plaintiff Williams testified that after one Hyster accident, her supervisor was angry and stated: "That's why I prefer to hire illegal people. There is none of this carryings on back here, all this talking, all this stuff going on." (Id. at 16-17.) According to Plaintiff Williams, Mr. Bennett stated that he preferred to hire illegals. (Id. at 20-21, 45-47.)

According to Plaintiff Williams, Mr. Bennett reported that he had obtained twenty-three replacement workers, and claimed that the workers were illegal workers. (S. Williams Dep. at 22-23.) Plaintiff Williams also recalled her supervisor stating that he could send "Wayne" to Texas to

33

bring back "enough people to replace the whole push." (Id.)
Plaintiff Williams testified that she reported Mr. Bennett's
comments to the plant manager, who informed Plaintiff to
do her job if she wanted it.  (Id. at 146-47.)  Similarly,
Plaintiff Williams testified that she reported Mr. Bennett's
comments to a human resources employee at her plant,
and that the human resources employee told Plaintiff
Williams that she needed to do her job.  (Id. at 146-48.)

According to Plaintiff Williams, "Wayne" reported that
he had been off from work because he had to go get his
son, who in turn had been to Texas to bring back illegal
workers.  (S. Williams Dep. at 36-37, 40-41.)  Plaintiff
Williams recalls hearing "through the plant" that the workers
were illegal. (Id. at 23, 43-44.) Plaintiff Williams recalls that
the employees could not speak English, and believes that

34

the employees were illegal workers because they could not speak English. (Id. at 47, 56-57.)

According to Plaintiff Williams, Wayne reported that two busloads of workers had arrived for Defendant, and that the workers were packed in like sardines. (S. Williams Dep. at 61-62.) Plaintiff Williams did not see a busload of illegal workers come to Defendant's facility where she worked. (Id. at 64.)

Plaintiff Williams also complains that Mr. Bennett called a temporary employment agency and obtained "Mexican" workers. (S. Williams Dep. at 48-49, 128.) Although Mr. Bennett referred to some full-time employees as illegal, Plaintiff Williams does not know first-hand whether the full-time employees or the temporary employees were illegal. (Id. at 50-51.)

35

Plaintiff Williams also recalls that an employee named "Carlos" had a number of Social Security cards, driver's licenses, and a big roll of cash. (S. Williams Dep. at 19, 53-54, 153-54.) According to Plaintiff Williams, Carlos offered to cash everyone's checks. (Id. at 73-74, 126, 128, 153.) Plaintiff Williams testified that Carlos claimed to be an illegal worker and that Carlos contended that Mr. Bennett had knowledge of this fact and that Mr. Bennett would not do anything about it. (Id. at 85-86.)

Plaintiff Williams further complains that a Hispanic woman named "Maria" performed Plaintiff Williams' job, and that Plaintiff Williams' wages were cut. (S. Williams Dep. at 21.) Plaintiff Williams recalls that Maria translated for individuals whom Plaintiff Williams believed were illegal workers. (Id. at 28-29.) Plaintiff Williams states that she

36

saw Maria give cards to "Mexicans," and that she heard Maria state on one occasion, "Here is your social security card." (Id. at 60, 65, 161-62, 175.)

Plaintiff Williams also recalls that one Hispanic employee left a plant operated by Defendant after an injury, and later came back to work for Defendant under a different name.    (S. Williams Dep. at 19, 79-85, 156-57, 172.) According to Plaintiff Williams, the injured employee and Carlos both indicated that the injured employee was an illegal worker. (Id. at 79-80, 82-83.) Plaintiff Williams states that another employee worked for Defendant at different facilities under different names.  (Id. at 157-58, 172.)

### ii.    Plaintiff Jones

Plaintiff Jones testified that she was working at Aladdin in 1993 or 1994  when the government raided the plant for

37

illegal workers. (Jones Dep. at 11-13, 37.) Plaintiff Jones also is aware of an audit that occurred more recently at the Caradon plant. (Id. at 13, 14-15.)

Plaintiff Jones complains that a number of employees had false identification documents; however, Plaintiff Jones cannot identify a specific employee or applicant who has false identification documents. (Jones Dep. at 22-23.) Similarly, Plaintiff Jones cannot identify a supervisor or hiring employee who knowingly accepted false work authorization documents or hired illegal aliens. (Id. at 22, 28-29.) Plaintiff Jones does not know which employees supervisors allegedly encouraged to return to the United States and to re-apply for work with Defendant. (Id. at 27-28.) Plaintiff Jones also is not aware of anyone with Defendant traveling to the United States border to recruit

AO 72A
(Rev.8/82)

undocumented aliens, transporting undocumented aliens, making incentive payments for locating such workers, providing housing to workers, helping workers find employment with Defendant, helping applicants apply for jobs, or destroying employment eligibility documents. (Id. at 28-32, 44, 63, 70-72.)  Plaintiff Jones complains that Defendant has more Hispanic workers than "American" workers.  (Id. at 45.)

Plaintiff Jones states that she learned that some employees left Defendant's employ but later returned approximately three or four months later using different names.  (Jones Dep. at 13-16, 56-59, 76.)  Plaintiff Jones also heard reports of illegal employees working under different names.  (Id. at 17.)

According to Plaintiff Jones, Bobby Tucker, who was

39

her supervisor at Aladdin in 1993, stated that he preferred to hire illegal workers. (Jones Dep. at 42, 51.) Plaintiff Jones recalled that Mr. Tucker stated that he preferred to hire illegal workers because they did their jobs and did not complain, and did not care whether they took breaks. (Id.)

### iii.  Plaintiff Pelfrey

Mr. Bennett was Plaintiff Pelfrey's supervisor in the shipping department of the print plant. (Pelfrey Dep. at 12, 16.) Plaintiff Pelfrey complains of suffering pay cuts and job transfers and seeing Hispanics performing her job. (Id. at 9-10, 13-14.) Plaintiff Pelfrey also contends that Mr. Bennett and the plant manager told employees that they preferred to hire illegal workers. (Id. at 89-90.)

Plaintiff Pelfrey has no first-hand knowledge that Defendant hired illegal aliens or individuals who were not

40

authorized to work in the United States. (Pelfrey Dep. at 54.) Plaintiff Pelfrey heard talk in the plant indicating that an employee named "Maria" was obtaining false documents for some illegal workers, but has no first-hand knowledge of this occurring or of anyone using false documents to obtain jobs with Defendant. (Id. at 76-78.) Plaintiff Pelfrey has no idea whether Maria received payment for her services, but heard a rumor that Maria received kickbacks for providing documents. (Id. at 130, 140-42.) Plaintiff Pelfrey contends that Maria received preferential treatment from their supervisor. (Id. at 141-42.)

Plaintiff Pelfrey also does not have first-hand knowledge of any of Defendant's employees helping aliens avoid detection or remain in the United States, and has no first-hand knowledge of Defendant's employees accepting

41

false documents. (Pelfrey Dep. at 111-13.) Plaintiff Pelfrey has no first-hand knowledge of any employees of Defendant allowing immigrants to live with them. (Id. at 54-55, 58-59, 81-83.) Plaintiff Pelfrey suspects that some of the employees, including temporary employees, were illegal workers because the employees could not speak English. (Id. at 30, 43-44, 66, 69, 97.)

Plaintiff Pelfrey recalls hearing that the son of an employee named Wayne Bishop picked up illegal workers and brought those employees to work at Defendant's facilities. (Pelfrey Dep. at 30, 34, 36-37.) Plaintiff Pelfrey, however, has no first-hand knowledge of this incident. (Id.)

Plaintiff Pelfrey recalls working with one Hispanic individual who left Defendant's employ after an injury, but later returned to work for Defendant under a different name.

42

(Pelfrey Dep. at 35, 38-41, 70.)   Plaintiff Pelfrey recalls Hispanic workers going home and coming back to work for Defendant, but does not know whether the workers were eligible to work in the United States.  (Id. at 72-74.)

Plaintiff Pelfrey recalls seeing a "bunch" of Social Security cards in an employee named Carlos's wallet. (Pelfrey Dep. at 30-32, 113.)   Although Plaintiff Pelfrey suspects that Carlos got kickbacks for bringing in workers, she has no first-hand knowledge that this occurred.  (Id. at 132-35, 139-40.)   Carlos, however, had lots of cash and offered to cash the employees' checks. (Id. at 30, 130, 132-35, 139-40.)   Plaintiff Pelfrey saw Carlos bring in one worker, but also knows that some workers rode with Carlos to work.  (Id.)  Plaintiff Pelfrey does not know whether the workers who rode with Carlos were temporary employees.

43

(<u>Id.</u>)

### iv.  Defendant's Documents

Plaintiffs have adduced evidence indicating that, at a June 26, 2003, human resources meeting, Defendant's human resources personnel discussed the fact that the Social Security Administration ("SSA") had sent Defendant a list of 800 social security numbers for employees that did not match the names of the employees.  (Pls.' Mot. Class Certification Ex. 5 at 1.)  Other evidence presented by Plaintiffs indicates that Defendant's human resources personnel forwarded the names of 400 individuals who reportedly had names and social security numbers either in Defendant's system or on their W-2 forms that did not match to the SSA's database.  (<u>Id.</u> Ex. 6.)  Defendant's human resources department requested that divisional human

44

resources directors contact the employees to verify the information. (Id.) Plaintiffs also have presented a March 21, 2007, memorandum to Defendant's twisting plant supervisors notifying the supervisors of recent problems with invalid cards. (Id. Ex. 8.)

### v.    Wal-Mart Complaint

In June 2005, an employee of Defendant's Home division complained to Wal-Mart's ethics hotline concerning Defendant's alleged use of illegal immigrants in a plant. (Pls.' Mot. Class Certification Ex. 9.)  Wal-Mart requested that Defendant investigate the complaint and provide a report to Wal-Mart.  (Id.)

### vi.    March 2006 E-Mail

In March 2006, one of Defendant's employees sent an e-mail reporting that representatives of Defendant had

45

asked two to three Hispanic employees in each of Defendant's sites about those employees' expectations of how Defendant's operations would be affected by a rally protesting a "crackdown" on illegal immigrants. (Pls.' Mot. Class Certification Ex. 4.) The e-mail stated: "All areas felt that it would have little to no impact because: The people live paycheck to paycheck & can't afford the loss. There is a rumor in practically every Site that the 'march' is really a plot by the INS to assemble a large group of illegals, arrest them, & deport." (Id.)

### vii. Declaration of Christina Martinez

Plaintiffs also have presented a declaration from Christina Martinez, who works as a piece goods clerk for Defendant. (Decl. of Christina Martinez ¶ 2.) According to Ms. Martinez, she has learned from her conversations with

46

AO 72A
(Rev.8/82)

other employees that a substantial number of Defendant's employees do not have proper documentation to work in the United States. (<u>Id.</u> ¶ 3.)  Ms. Martinez complains that one of Defendant's human resources employees stated that she was aware that many of Defendant's employees were not legally authorized to work in the United States, but if applicants came to Defendant with a social security number and a false identification card, she could and would hire the applicants, and Defendant would employ the applicants. (<u>Id.</u> ¶ 4.)

Ms. Martinez further asserts that she provided translation services for November 2006 meetings concerning converting temporary employees to permanent employees of Defendant. (Martinez Decl. ¶ 5.) According to Ms. Martinez, a number of temporary employees stated

47

that they could not convert to permanent employment because they did not have the correct documentation.  (Id. ¶ 6.)

According to Ms. Martinez, in December 2006, she was directed to meet with an attorney for Defendant.  (Martinez Decl. ¶ 7.)  During that meeting, the attorney informed Ms. Martinez of a lawsuit and asked her about four temporary employees.  (Id.)  Ms. Martinez informed the attorney that she understood that those employees could not legally work in the United States.  (Id.)  Ms. Martinez contends that, shortly after her meeting with Defendant's attorney's, three of Defendant's human resources employees informed her that she should not be seeking information concerning the work status of Defendant's employees, as this task was human resources' job, and stated that, if she did so again,

48

"'it could cost you your job.'"  (Id. ¶ 8.)

### viii. **Carpenter** Action

Plaintiffs also have presented a copy of the complaint in Carpenter v. Mohawk Industries, Inc., Civil Action File No. 4:07-CV-0049-HLM.  (Pls.' Mot. Class Certification Ex. 35.) In that action, the plaintiff, a former supervisor at one of Defendant's plants, asserts that Defendant terminated his employment after the plaintiff notified Defendant that some of the temporary workers at the plant were illegal immigrants.

### 8.   Expert Evidence

### a.   Dr. Borjas

Plaintiffs propose to present expert testimony from George Borjas, a labor economist.  (Decl. of George Borjas ¶ 1.)  Dr. Borjas asserts that he has performed empirical

49

research concerning the impact of increased immigration on wages and employment opportunities of the pre-existing work force.  (Id. ¶ 7.)  According to Dr. Borjas, standard models of economic theory reveal unambiguous implications concerning the impact of immigration-induced supply shifts on the earnings of competing workers.  (Id. ¶ 8.) Specifically, Dr. Borjas opines that, other things being equal, an immigration-induced increase in the size of the workforce deceases the wage of competing workers.  (Id. ¶ 9.)

According to Dr. Borjas, he prepared a 2003 paper that addressed a methodological approach to estimate the responsiveness in wages of competing workers to an immigration-induced increase in the labor supply.  (Borjas Decl. ¶ 10.)  According to Dr. Borjas, that paper revealed that wages during a particular decade grew slowest for

AO 72A

(Rev.8/82)

those groups that experienced the largest increase in immigration, and indicated that a ten percent immigration-induced increase in the supply of workers deceased the wages of competing workers by three to four percent. (Id.)

Dr. Borjas opines that he can apply the econometric framework from his 2003 paper to the situation at issue in this litigation. (Borjas Decl. ¶ 11.) Dr. Borjas further states that he has used methods to estimate the wage impact of hiring illegal immigrants by a particular firm in a similar case involving pending litigation. (Id.) According to Dr. Borjas, the key result from this analysis, wage elasticity, measures the responsiveness of wages to an immigration-induced increase in the supply of labor, which, in turn, can be used to calculate the damages to Plaintiffs on a class-wide basis. (Id. ¶ 12.) Dr. Borjas states that he is not aware of

51

conceptual difficulties that will prevent application of those standard methodological approaches to this case. (Id. ¶ 13.)

Dr. Borjas opines that Defendant's alleged practice of hiring illegal immigrants would tend to depress the wages that Defendant pays its workers below what would otherwise have been observed. (Borjas Decl. ¶ 14.) Dr. Borjas discusses Defendant's wage-setting practices and wage progression tables, and opines that Defendant's approach to setting wages does not seem consistent with the wage-setting practices that one would expect to observe for a firm that attracts labor from a local pool of applicants by offering competitive wages that vary with local market conditions. (Id. ¶¶ 15-18.) According to Dr. Borjas, Defendant's approach to setting wages instead seems consistent with

AO 72A

(Rev.8/82)

that of a firm that pays a wage that guarantees a steady supply of applicant labor from some source, not necessarily from the local labor market, and that this approach could be the result of access to a steady supply of undocumented labor that did not originate in the local labor market. (Id. ¶ 18.)

Dr. Borjas opines that he can apply regression analysis to estimate wage elasticity to measure responsiveness, in percentage terms, of average hourly earnings for Defendant's employees to a percentage increase in the labor supply. (Borjas Decl. ¶ 19.) Dr. Borjas sets forth a description of this analysis, as well as a description of the analysis to be used to estimate damages. (Id. ¶¶ 20-21.) Dr. Borjas opines that damages for the individual class members and for the class can be established and

53

calculated on a class-wide basis.  (Id. ¶ 25.)

### b.    Daniel S. Hamermesh, Ph.D.

Plaintiffs also have presented a declaration from Dr. Daniel S. Hamermesh, who studies the demand for labor. (Decl. of Daniel S. Hamermesh ¶ 1.)    Dr. Hamermesh opines that the theory of labor implies that one can expect a firm's hiring of illegal workers to reduce the total wages of the firm's legal employees.   (Id. ¶ 2.)    Dr. Hamermesh observes that the issue presented in this case is: "What happens in a labor market, and in an individual firm that employs workers in that market, when there is an increase in the supply of workers available to a particular firm in that market?"   (Id. ¶ 4.)    According to Dr. Hamermesh, the analysis of changes such as that one has become fairly standard in the study of labor markets.  (Id. ¶ 5.)

54

Dr. Hamermesh opines that "the exogenous increase in the supply of workers of a given type can generally have two different direct impacts on employed workers in the labor market where it occurs." (Hamermesh Decl. ¶ 5.) First, if the existing workers' hourly rates are rigid and cannot be competed down by the new workers, the demand for existing workers' services will be reduced, causing them to lose their jobs or work reduced hours. (Id.) Second, if wage rates are flexible, the total wages of at least some workers in the labor market will decrease. (Id.)

Dr. Hamermesh further opines that the influx of workers will have a greater impact on reduced wage rates and total wages among the low-skilled legal workers "who compete most closely with a low-skilled group of illegal immigrants who are brought into a labor market." (Id. ¶ 7.) According

55

to Dr. Hamermesh, the applicable literature clearly indicates that immigrants to the United States reduce the wages of lower-skilled, lower-wage native workers.  (Id. ¶ 8.)  Dr. Hamermesh opines that multiple regression analysis could be used to estimate the alleged impact of Defendant's alleged use of illegal immigrant workers on wages of its other workers.  (Id. ¶ 11.)  According to Dr. Hamermesh, using that analysis, "one can infer what the wage rates and total wages of the affected legal workers would have been had the illegal workers not been hired by the company. (Id. ¶ 12.)

Dr. Hamermesh further states that he believes that "the theory and statistical methods of labor economics can be usefully applied to this case."  (Hamermesh Decl. ¶ 13.) According to Dr. Hamermesh, with appropriate data, he or

AO 72A
(Rev.8/82)

another experienced labor economist can "measure the impact of the influx of illegal workers on individual legal employees at Mohawk and on those employees as a class." (Id. ¶ 13.)

### c.    Criticisms by Defendant

### i.    Declaration of Finis Welch

Defendant has presented the Declaration of Finis Welch, Ph.D., in opposition to Plaintiffs' Motion for Class Certification. (Def.'s Resp. Pls.' Mot. Class Certification Ex. 15.)  Dr. Welch attempts to review and comment upon Dr. Borjas' declaration and upon the declaration of Dr. Hamermesh. (Decl. of Finis Welch, Ph.D. ¶ 4.)

Dr. Welch opines that: (1) Dr. Borjas' methodology is based on an analysis that Dr. Borjas previously rejected, (Welch Decl. ¶¶ 6, 9-11); (2) Dr. Borjas consistently has

taken the position that examining the local effects of immigration is not possible, and that attempts to do so yield results that are completely uninformative, (id. ¶¶ 6, 12-15); (3) Dr. Borjas repeatedly has concluded that wage impacts of immigration can only be calculated at the national level due to capital and labor mobility and immigrant location decisions, (id. ¶¶ 6, 16-21); and (4) Dr. Borjas has noted that some groups of workers–specifically, those with skills that differ from the skills possessed by immigrants, actually may gain from a nationwide increase in immigration, (id. ¶¶ 6, 42-46).

Dr. Welch complains that Dr. Hamermesh has described immigration inaccurately as an "exogenous shock," and has ignored the interconnectedness of labor markets. (Welch Decl. ¶¶ 6, 35-40.) Consequently, Dr.

AO 72A

(Rev.8/82)

Welch opines that Dr. Hamermesh cannot identify, or estimate, the impact of Defendant's alleged hiring of illegal workers on the wages of Defendant's legal workers. (Id. ¶¶ 6, 40-41.) Dr. Welch further opines that Dr. Hamermesh's statistical methodology does not provide a reliable benchmark for making wage comparisons to Defendant's employees. (Id. ¶ 6; 40-41.)

Dr. Welch further opines that Defendant's own database reveals "notable variation" in the use of temporary workers across Defendant's various locations. (Welch Decl. ¶ 51.) Dr. Welch observes that Defendant has numerous vendors that supply it with temporary workers. (Id. ¶ 52.) Dr. Welch also notes that many of Defendant's hourly employees likely never worked at locations that used temporary employees. (Id. ¶ 53.)

59

## ii.    Declaration of Robert C. Divine

Defendant also has presented the Declaration of Robert

C. Divine.  (Def.'s Resp. Pls.' Mot. Class Certification Ex.

16.)[1]  Robert C. Divine is an attorney who practices in the

area of immigration law.  (Decl. of Robert C. Divine ¶¶ 1-2.)

Attorney Divine previously served as the first Chief Counsel

of U.S. Citizenship and Immigration Services ("USCIS"), an

---

[1]In a footnote in their reply brief, Plaintiffs argue that the Court should strike Attorney Devine's declaration, contending that Attorney Devine's declaration actually is a thirty-page legal brief filed in violation of the page limitations.  To the extent that Plaintiffs sought to strike Attorney Devine's declaration, Plaintiffs should have filed a separate Motion to Strike or Notice of Objection to that declaration.  Simply requesting affirmative relief in a footnote or the body of a reply brief is not sufficient to trigger the motions reporting system used by the Clerk's office, and a party who requests relief in this way runs a very real risk of having his or her request for relief overlooked.

In any event, the Court declines to strike Attorney Devine's declaration as a legal brief.  Instead, the Court has not considered the portions of that declaration that simply appear to be legal conclusions.  The Court further observes that Attorney Devine's declaration did not affect the Court's decision as to class certification.

60

agency within the United States Department of Homeland Security.  (Id. ¶ 4.)  Attorney Divine also previously served as the acting director and acting deputy director of USCIS. (Id.)

USCIS manages the electronic employment verification system originally known as Basic Pilot and now known as E-Verify.  (Devine Decl. ¶ 5.)  According to Attorney Devine, Plaintiffs' proposal that they can ascertain who is "legally authorized to be employed in the United States" by having the Court order Defendant to run its employees' names through Basic Pilot or E-Verify is erroneous.  (Id. ¶ 11.) Attorney Devine complains that neither E-Verify nor the SSA's Social Security Number Verification Service ("SSNVS") allow the types of queries that Plaintiffs propose to submit.  (Id. ¶ 15.)  According to Attorney Devine, E-

61

AO 72A
(Rev.8/82)

Verify: (1) only allows employers to submit queries about current employees at the time of hiring of the employees; (2) does not allow queries for workers after hiring; and (3) does not allow queries for former employees or applicants who are not hired.    (Id.)    Attorney Devine also notes that although the SSNVS allows queries about existing and former employees, those queries are allowed only to ensure that the records of such employees are correct for purposes of completing Internal Revenue Service Form W-2.    (Id.) According to Attorney Devine, even if the queries proposed by Plaintiffs were permissible, the responses to those inquiries would not necessarily determine which workers are authorized to work in the United States.    (Id. ¶¶ 16-26.) Attorney Devine opines that proposed queries using private databases suffer from similar problems.    (Id. ¶¶ 27-28.)

62

Similarly, Attorney Devine notes that SSA no-match letters, health insurer notifications, and I-9 forms do not establish whether given workers are authorized to work in the United States.   (<u>Id.</u> ¶¶ 29-30, 32-37.)   Finally, Attorney Devine opines that federal law prohibits an employer from using English language proficiency to determine whether a worker is authorized to work in the United States.  (<u>Id.</u> ¶¶ 38-53.)

### 9.    Qualifications of Plaintiffs' Counsel

### a.    Bobby Lee Cook

Bobby Lee Cook, an attorney representing Plaintiffs, has experience representing classes in class actions, and has been approved to act as class counsel in a number of cases.  (Decl. of Bobby Lee Cook ¶ 2.)  Attorney Cook has presented a declaration detailing the work that he and his co-counsel have performed in this case.   (<u>Id.</u> ¶ 3.)

63

According to Attorney Cook, he has the experience and skill necessary to represent the class in this case.  (Id. ¶ 4.)

### b.  John E. Floyd

Similarly, Attorney John E. Floyd, who also serves as class counsel for Plaintiffs, has submitted a declaration indicating that his law firm has handled a number of federal and Georgia RICO cases, including class action cases. (Decl. of John E. Floyd ¶ 2.)  Attorney Floyd states that he has experience in litigating complex cases involving RICO claims, and that he has authored several publications concerning RICO.  (Id. ¶ 3.)  Attorney Floyd also indicates that the other attorneys from his law firm who are participating in this case have prior experience with class actions.  (Id. ¶¶ 6-9.)  Attorney Floyd further provides information concerning the work that he and his co-counsel

AO 72A

(Rev.8/82)